```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                       Case No. 16-80043-CR-COHN
 3

 4   UNITED STATES OF AMERICA,   )
                                 )
 5            Plaintiff,         )
                                 )
 6         -v-                   )
                                 )
 7   PRESTON ALEXANDER McWATERS,)
                                 )
 8            Defendant.         )   Fort Lauderdale, Florida
                                 )   November 29, 2016
 9   _____)   9:30 a.m.

10

11

12             TRANSCRIPT OF SENTENCING PROCEEDINGS

13           BEFORE THE HONORABLE JAMES I. COHN

14                   U.S. DISTRICT JUDGE

15

16   Appearances:

17

     For the Government:        ADAMS FELS
18                              KAREN GILBERT
                                Assistant United States Attorneys
19                              99 NE 4th Street
                                Miami, Florida  33132
20
     For the Defendant:         HALEY & JHONES, PA
21                              BY:  ANA JHONES, ESQ.
                                9100 South Dadeland Boulevard
22                              Miami, Florida  33156

23
     Reporter:                  Karl Shires, RMR, FCRR
24   (954) 769-5496             Official Court Reporter
                                299 East Broward Boulevard, # 203G
25                              Fort Lauderdale, Florida  33301
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

1                          I N D E X

2    WITNESS                                              PAGE

3    MICHAEL BRANNON, DEFENDANT'S WITNESS, SWORN ................8
     DIRECT EXAMINATION BY MS. JHONES ...........................8
4    CROSS-EXAMINATION BY MS. GILBERT .........................25
     REDIRECT EXAMINATION BY MS. JHONES .......................36

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

          STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1          (Call to Order of the Court.)

 2          THE COURT:  Good morning.  The matter before the Court

 3   is the United States of America versus Preston Alexander

 4   McWaters.  This is Case Number 16-80043-CR.

 5          Mr. McWaters is present.  He is represented by Ana

 6   Jhones.  The government is represented by Assistant United

 7   States Attorneys Adam Fels and Karen Gilbert.

 8          On July 13th of this year, Mr. McWaters entered a plea

 9   of guilty to Counts 5, 7, 8, 9, 13, and 15 of a 15-count

10   indictment.  Counts 5, 9, 13, and 15 each charged transmission

11   in interstate commerce of a communication threat to injure the

12   person of another, in violation of 18 United States Code

13   § 875(c).  Counts 7 and 8 charged conveying false information

14   regarding explosive devices, in violation of 18 United States

15   Code § 1038(a)(1)A.

16          Upon acceptance of Mr. McWaters' plea, the Court

17   adjudged him guilty of Counts 5, 7, 8, 9, 13, and 15, ordered a

18   presentence investigation report, and deferred sentence until

19   today's date.

20          Have counsel for the respective parties received a

21   copy of the presentence report?

22          Mr. Fels?

23          MR. FELS:  Yes, we have, Your Honor.

24          THE COURT:  Ms. Jhones?

25          MS. JHONES:  Yes, Your Honor.
```

```
 1              THE COURT:  And Mr. McWaters, have you received and
 2    reviewed the presentence report?
 3              THE DEFENDANT:  Yes, Your Honor.
 4              THE COURT:  Okay.  Are there any objections?
 5              MS. JHONES:  Your Honor, I have not filed any
 6    objections.  I do want to just make a couple of -- I guess
 7    there is one objection, which is minor in nature, and I want to
 8    supplement the PSI by having the Court include the forensic
 9    evaluation that I have tendered to the Court and I'm going to
10    be filing under seal this morning.
11              The PSI is incomplete as it relates to the mental
12    health issues that are pertinent both in terms of treatment of
13    Mr. McWaters and --
14              THE COURT:  Is there any objection to including the
15    forensic psychological evaluation of Dr. Brannon as part of the
16    presentence investigation report?
17              MR. FELS:  No, Your Honor.  There's no objection.
18              THE COURT:  All right.  That request is granted.
19              MS. JHONES:  Thank you, Your Honor.
20              And the only, again, objection, factual objection,
21    which really is -- it goes to -- on Page 10, Paragraph 23, Your
22    Honor, it only has to do with a statement that was made by
23    Ms. Devon Kenny, who is the victim in this case, where she
24    characterizes that she has been harassed by Mr. McWaters for
25    years.  And it's the reference to "years" is that I take issue
```

1   with.  And certainly there was a restraining order against

2   Mr. McWaters.  But in terms of the time period that -- as I

3   will set forth in my mitigation explanation, I think that the

4   reference to the amount of time, years, as opposed to at most a

5   year is the only part that I take exception to.  Otherwise the

6   report is accurate.

7           THE COURT:  Does the government wish to be heard?

8           MR. FELS:  Your Honor, we don't think it's important

9   or critical to --

10          THE COURT:  I tend to agree.  It will not have a

11  bearing upon the Court's determination of an appropriate

12  sentence.

13          MS. JHONES:  I understand.  I just wanted to make the

14  point.  But thank you, Your Honor.

15          THE COURT:  All right.  With respect to the advisory

16  guidelines, the Court makes the following findings.  The total

17  offense level is 18.  The criminal history category is I.  The

18  advisory imprisonment range is 27 to 33 months.  Probation,

19  ineligible.  Supervised release range is one to three years.

20  The fine range is $10,000 to $100,000.  Restitution is yet to

21  be determined.  And there is a mandatory special assessment of

22  $100 per count for a total of $600.

23          Does the government have a -- well, let's do this.  I

24  know you've got mitigation that you want to present.  So let me

25  let --

1        MR. FELS:  Your Honor, before we do that, there is an

2   agreement between the parties, Your Honor --

3        THE COURT:  Okay.

4        MR. FELS:  -- which is that Mr. McWaters not receive

5   the three levels for acceptance of responsibility.  And that's

6   based on his continued criminal conduct even after his change

7   of plea.  Let me just explain on the record what that deal is.

8        Your Honor, we have concrete evidence that

9   Mr. McWaters continued to send letters, continued to victimize

10  the individual, initials E.M., by attempting to mail on one

11  occasion and actually mailing on a second occasion two

12  threatening communications; one to the United States Probation

13  Office in Miami; the other to his former counsel, the Federal

14  Public Defender.

15       The agreement reached by the parties is that the

16  government not pursue any sort of obstruction of justice;

17  however, the parties agree that the three levels for acceptance

18  of responsibility no longer be credited to Mr. McWaters.  And I

19  should also --

20       THE COURT:  So there's an agreement then that the

21  total offense level would be 21 instead of 18?

22       MR. FELS:  That is correct, Your Honor.

23       THE COURT:  Okay.

24       MR. FELS:  But also, Your Honor, we have agreed, and

25  we want to put this on the record, that although we have

1  sufficient evidence, more than sufficient evidence to proceed

2  with a second indictment which, of course, would be assessed at

3  a higher criminal history, the government will not pursue that

4  second indictment and will just proceed with the three levels

5  for acceptance of responsibility, which is a substantial

6  concession to the defendant because that means that another

7  second -- a consecutive sentence is avoided, Your Honor.

8          THE COURT:  All right.  So that would now place us in

9  a range of 37 to 46 months, correct?

10         MR. FELS:  That is correct, Your Honor.

11         THE COURT:  Probation would still be ineligible.

12         Supervised release, Mr. McKinney, is that impacted?

13         THE PROBATION OFFICER:  Well, it will still remain at

14  one to three years.

15         THE COURT:  One to three years.  What about the fine

16  range?

17         THE PROBATION OFFICER:  The fine range now is $15,000

18  to $150,000.

19         THE COURT:  15,000 to 150,000.

20         Okay.  All right.  With that understanding, I know

21  that Dr. Brannon is here.  So Ms. Jhones, I'll turn it over to

22  you.

23         MS. JHONES:  Thank you, Your Honor.  Your Honor, I

24  apologize for the timing of providing the Court with the

25  forensic report, but I did --

```
 1              THE COURT:  It's not a problem.
 2              MS. JHONES:  Okay.  Thank you, Your Honor.
 3              At this time I would like to present evidence in the
 4   form of expert testimony from Dr. Brannon, if I may.
 5              THE COURT:  Yes.  Doctor.
 6               MICHAEL BRANNON, DEFENDANT'S WITNESS, SWORN
 7              THE COURT:  Please be seated.
 8              Doctor, please, once you get situated, give us your
 9   name and spell your last name for the record.
10              THE WITNESS:  Michael Brannon, B-R-A-N-N-O-N.
11              THE COURT:  All right.  Ms. Jhones, you may inquire.
12                         DIRECT EXAMINATION
13   BY MS. JHONES:
14   Q.  Dr. Brannon, good morning.
15   A.  Good morning.
16   Q.  Would you please state for the record your occupation.
17   A.  Sure.  I'm a psychologist.  I'm licensed in the state of
18   Florida.  I've been licensed since 1990.  I'm also licensed in
19   the state of North Carolina.
20   Q.  And Dr. Brannon, could you briefly tell us how long --
21   presently how are you employed?
22   A.  I am the codirector, along with my partner Dr. Sheri
23   Burke-Carter, of the Institute for Behavioral Sciences and the
24   Law.  I've worked almost exclusively in the area of forensic
25   psychology since 1994.
```

1    Q.  How long have you held the company or the position that you

2    currently hold?

3    A.  Our company opened in 1999, and we've been together as a

4    partnership since then.

5    Q.  And Dr. Brannon, prior to that particular endeavor, were

6    you previously employed also in the area of psychology?

7    A.  I was.  Yes.  I worked as a solo practitioner, had my own

8    forensic practice since 1994.  Prior to that time I worked

9    primarily in the area of clinical psychology.  So before '94 I

10   did what people generally think of in terms of psychologists.

11          MS. GILBERT:  Excuse me.  Your Honor, we certainly

12   understand that he's qualified to testify as an expert in this

13   field.  So if we wanted to move beyond the qualifications and

14   get to the heart of it, we're happy to stipulate to that.

15          MS. JHONES:  If she wants to get to the meat of the

16   coconut, Your Honor, I'm fine with that.

17          THE COURT:  All right.  The Court will recognize

18   Dr. Brannon as an expert in the field of psychology.

19   Accordingly, he will be permitted to render opinions within

20   that field of expertise.

21          MS. JHONES:  Thank you, Your Honor.  Just a couple of

22   questions in regards to his area of expertise.

23   BY MS. JHONES:

24   Q.  Dr. Brannon, have you ever been -- tell us what areas of

25   psychology have you been deemed to be an expert in.

```
 1   A.  Well, there's several, but most of my time is spent in the

 2   area of criminal offenses.  So my evaluations consist of

 3   sentencing evaluations, competency to proceed evaluations,

 4   sanity at the time of the offense, competency to waive Miranda,

 5   violence risk assessments, diagnosing to be able to set up

 6   appropriate treatment plans for diversions.  So those are just

 7   some of the many evaluations I've a done over the years.

 8   Q.  Have you served as an expert on behalf of one side or the

 9   other in terms of defense or prosecution?

10   A.  I have.  I've worked for both.  I'm hired by both the

11   prosecution as well as by the defense.  I'm appointed by the

12   Courts frequently, both federal and state.  So I've really

13   worked on both sides.  So just depending on what period of time

14   it might be, I might have slightly more referrals from, lets

15   say, the defense or slightly more from the prosecution.

16   Q.  Okay.  Thank you.

17        Did there come a time where you were called upon to

18   perform an evaluation in this case?

19   A.  Yes, I was.

20   Q.  And would you tell us, please, in preparation for that

21   evaluation, did you review any documents?

22   A.  I did.

23   Q.  And would you tell us what you reviewed, sir?

24   A.  Sure.  I reviewed a psychiatric evaluation by Dr. Colleen

25   McLemore.  That was from 1996.  I also reviewed a psychological
```

1    report from Dr. Jean Baker, also from 1996; a neurological

2    report by Dr. Edward Novi, a neurologist, from 1998; and

3    various treatment records and reports from Charter Behavioral

4    Health Systems of Athens.  I also had a chance to review the

5    indictment and the factual basis for the indictment.

6    Q.   Okay.  Now, doctor, did you perform -- well, first of all,

7    did you have occasion to meet with Mr. McWaters?

8    A.   I did, yes.

9    Q.   Tell us about how many times did you meet with him?

10   A.   I met with him on two occasions.  November 3rd of this

11   year, 2016, as well as November the 18th of 2016.

12   Q.   Did you perform any testing on Mr. McWaters?

13   A.   I did, yes.

14   Q.   Could you give us a brief summary of the tests that you

15   performed?

16   A.   Sure.  I conducted several different tests that are deemed

17   to be forensically appropriate, meaning there's validity scales

18   in most of these tests to assess response style.  People in

19   these settings oftentimes have motivation to deceive or

20   exaggerate or fabricate symptoms.  So I used forensically

21   appropriate instruments.

22        Those tests consisted of the Minnesota Multiphasic

23   Personality Inventory, 2nd Edition; the Substance Abuse Subtle

24   Screening Inventory, 4th Edition; the Beck Anxiety Inventory;

25   the Miller Forensic Assessment of Symptoms test; and the Beck

 1   Depression Inventory, 2nd Edition.

 2   Q.  Of those tests, Dr. Brannon, which tests, if any, are

 3   designed to assist you to try to ascertain whether or not

 4   Mr. McWaters would be malingering or tried to engage in

 5   deception?

 6   A.  Three of the tests have what's called validity scales or

 7   measures of response distortion; is the individual trying to

 8   look worse than they are, better than they are, or are they

 9   randomly responding to test items.  I mean, they don't care

10   about the item content.  They've just trying to get the testing

11   situation over with.

12          So the three tests that contained validity scales are

13   the -- and I'll use the acronyms -- MMPI-2, the SASSI-4, and

14   also the one test that I used called the M-FAST is specifically

15   designed to assess for the construct of malingering or the

16   purposeful exaggeration or fabrication of symptoms.

17   Q.  In this particular case, did you find that Mr. McWaters was

18   attempting to engage in any type of malingering?

19   A.  No, there's no evidence on any test scale that he's trying

20   to look worse than he is or make up any sort of psychological

21   symptoms or problems or issues.

22   Q.  Okay.  Did you speak to anybody besides Mr. McWaters in

23   preparation for your evaluation?

24   A.  I did.  And I would make one note on my previous answer.

25   His response style actually is the opposite of malingering or

1    feigning.  He actually minimizes problem areas.  He's

2    embarrassed by problem areas.  So the test scales, the validity

3    scales really show that he minimizes problems, which is

4    something you don't see often in a forensic setting.  Usually

5    people exaggerate or try to look worse than they are.  He

6    really did the opposite in terms of his test responsiveness.

7         I did speak -- in response to your most recent

8    question, I did speak to his mother by telephone, Ms. Toni

9    Fellabaum (phonetic).

10   Q.  And doctor, based on review of documents and based on your

11   testing and your interviews with Mr. McWaters, did you arrive

12   at any diagnosis with respect to Mr. McWaters?

13   A.  I did, yes.

14   Q.  Could you please tell us what your diagnose is.

15   A.  Sure.  It's rather clear from reviewing records, extensive

16   records going all the way back to 1996, that the diagnosing was

17   really done long before I conducted this evaluation.  But my

18   results in terms of history and all of the information I have

19   is consistent with these earlier diagnosis.

20        He was actually interviewed and evaluated at the age

21   of five, starting at the age of five.  So we have a very good

22   history of varied professional psychologists, psychiatrists,

23   neurologists giving us information.  They all seem to coalesce

24   on the same set -- relatively the same set of diagnosis.

25        Those would be attention-deficit/hyperactivity

1   disorder and Tourette's disorder.  There were some other

2   interchanged diagnosis too; bipolar disorder at one point,

3   oppositional defiant disorder at some point as well.  I would

4   add an addition diagnosis of alcohol use disorder which wasn't

5   in his childhood records.

6   Q.   Okay.  If we could just break those down starting with the

7   attention-deficit/hyperactivity disorder.

8   A.   Yes.

9   Q.   Typically when you hear of -- that's commonly known as

10  ADHD, correct?

11  A.   Correct.

12  Q.   Typically when we hear that diagnosis, we think of

13  children -- a diagnosis that is aptly named for children --

14  A.   Correct.

15  Q.   -- as posed to adults.  So explain to us how it is that an

16  adult -- Mr. McWaters is 26 years of age -- actually could

17  still suffer from a disorder such as this.

18  A.   Sure.  Briefly and in summary, the -- we used to believe

19  that attention-deficit disorder only affected children because

20  it was seen most often in a school setting.  So their behavior

21  was more noticeable.  It usually had to do with not being able

22  to pay attention or being hyperactive, not being able to sit

23  still, and being impulsive, calling out, saying things, doing

24  things to disrupt or cause attention to come to themselves.

25          We used to think as well that most people grew out of

1    attention-deficit disorder, that as you got older, your brain

2    developed.  It was initially called minimal brain damage.  So

3    we started in the right place and then drifted away from that.

4    And we used to think that everyone just grew out of it.  But

5    then we learned that the demands of their environment usually

6    lessen when they get out of high school.  So it's not as

7    noticeable.  But it still remains a salient feature of a

8    person's psychological dynamics as they get older.

9            As a matter of fact, the Diagnostic and Statistical

10   Manual, 5th Edition, which is our latest version of the DSM,

11   clearly outlines adult attention-deficit/hyperactivity disorder

12   to remind us that this is a neurodevelopmental disorder, it has

13   to do with having a different brain, and it has to do with

14   symptoms that still appear in adulthood but appear differently

15   in adulthood, but it still has as much impact on an adult's

16   life as it does on a child's life.

17   Q.  When you say that they appear differently, could you give

18   us examples of how they appear in terms of an adult as posed to

19   a child?

20   A.  Sure.  ADHD, especially if it's diagnosed early, if

21   symptoms are seen early, it tends to be more severe and have

22   more of a likelihood to last throughout a life-span.  We know

23   that symptoms can appear that have to do with things like poor

24   reasoning and poor judgment, impulsivity, inattentiveness to

25   important details, immaturity, difficulty being able to

Direct - Brannon                    16

1    anticipate future consequences.  It's not a matter of

2    intelligence.  It's just a matter of living in the moment as

3    opposed to anticipating or thinking about future consequences.

4         So in a person with adult ADHD, tends to live in a

5    fantastical type of world in which they live in the moment and

6    only think about their impulsive actions.  It's comparable to

7    having bad brakes or impaired brakes on a car.  You know what

8    you're supposed to do, but can't slow the car down.

9    Q.   Okay.  Doctor, did you have any additional diagnosis for

10   Mr. McWaters besides the ADHD?

11   A.   I did.  I agree with all of the prior individuals who I

12   mentioned that provided even more extensive evaluations than I

13   did in regards to early childhood development.  I think it's

14   appropriate to use the same diagnosis that was used back in

15   '95, '96, Tourette's disorder.  I think he still has symptoms

16   of that condition and still reports a pretty replete history of

17   symptoms of Tourette's.

18   Q.   During the course of your evaluation -- a review of the

19   evaluations that were provided to you, did you also see whether

20   or not Mr. McWaters had received any treatment for his

21   conditions?

22   A.   When he was younger, when he was a child, he -- when he

23   moved from -- his parents divorced when he was very young.  And

24   when he relocated in his teenage years from his mother's house

25   to father's house, treatment stopped.  His father pretty much

Direct - Brannon                           17

1   brought an end to medications and things like that, which

2   really assist in both of those conditions.  But he was, prior

3   to that time, on medications for both his ADHD and Tourette's.

4   But he's not received any treatment for those conditions past

5   his late childhood years.

6   Q.   Okay.  You mentioned also that you added a disorder,

7   alcohol use disorder.

8   A.   Yes.

9   Q.   Could you please elaborate on that.

10  A.   Sure.  Oftentimes individuals with the type of conditions

11  that in this case Mr. McWaters have resort to some form of

12  self-medication.  And certainly it appears that he did that

13  through the course of his life.  It appears that he's had some

14  alcohol problems, alcohol abuse problems, and that he

15  particularly uses alcohol at times during emotional distress.

16  So he tries to minimize and talk about that as not being a

17  large problem in his life, but again it seems to be pretty well

18  connected to his behavior, especially impulsive behavior.

19  Q.   During your course of the review of the documents,

20  Dr. Brannon, did you see any history of alcoholism in the

21  family?

22  A.   Yes, there is a family history.  So certainly with several

23  family members.  He reports, meaning Mr. McWaters reports that

24  as well.  He reports both his father and brother had

25  difficulties, and that was corroborated in the records.

Direct - Brannon                                    18

1    Q.  Okay.  Did you see any history of mental illness on the

2    side of either of the parents?

3    A.  There certainly may be.  I mean, Mr. McWaters reports, no,

4    that there's not a family history.  His mother reported

5    differently.  She reported that paternal grandparents had

6    mental health problems and difficulties.

7    Q.  Okay.  Any other diagnosis, doctor?

8    A.  The only other possible diagnoses, and there were certainly

9    references to different mood disorders, mood disorders, things

10   like depression or bipolar disorder, those types of things.  In

11   the past he even had a rule-out diagnoses for bipolar disorder,

12   which oftentimes goes hand in hand with attention-deficit

13   disorder.  Not always, not most of the time, but a large

14   minority of the time.

15          I gave a rule-out diagnoses of unspecified mood

16   disorder.  We know there's a high concordance rate, as I said,

17   between impulsive disorders, neurodevelopmental disorders, and

18   secondary depressions.  It appears he's had symptoms of

19   depression, but I could not give that as a full diagnoses

20   because he's really denied any symptoms of depression, anxiety,

21   et cetera.  But we know that he minimizes and denies.  So

22   certainly there's a suggestion that there might be some form of

23   mood disorder.

24   Q.  Now, doctor, in terms of -- let's start with the

25   attention-deficit disorder.  Is this the type of disorder for

1    which there's treatment available?

2    A.   Yes.

3    Q.   And could you tell us about what is typical treatment that

4    one receives for the adult ADHD?

5    A.   The best form of treatment strategies or interventions has

6    to do with the prescription of stimulant medication --

7    Adderall, Concerta, Ritalin, substances like that -- and being

8    able to avail oneself of some type of structured therapy or

9    treatment where they learn skills to control their impulses

10   better and to be able to think through their behavior before

11   they enact it.  So someone who's trained and skilled in the

12   area of adult attention-deficit disorder, helping guide them

13   and giving them role-playing examples of how to better conduct

14   their life while them having medication which helps to improve,

15   to use my earlier example, the lining on the brakes, if you

16   will.

17   Q.   Okay.  And did -- you are familiar with the facts of this

18   case having reviewed the factual proffer in support of the

19   plea, correct?

20   A.   I did, yes.

21   Q.   Could you explain to the Court how the ADHD may have played

22   a role in the commission of the offense?

23   A.   Well, it certainly doesn't cause it.  I mean, ADHD doesn't

24   cause someone to engage in those type of behaviors, but

25   certainly it can set the stage for someone to engage in

Direct - Brannon                    20

1   behaviors that bring them to the attention of the law.  It can

2   allow them to engage in behaviors without poor or with poor

3   anticipation of future consequences, of having kind of a

4   fantastical way of viewing the world and the impact of the

5   world.

6            What happens oftentimes with Tourette's, especially,

7   is that people don't form good relationships with others.

8   They're inexperienced at that.  So what they wind up doing is

9   taking steps or doing things without considering the

10  consequences of those actions, especially when they're upset or

11  angry or feel rejected in some way.  That's how both the ADHD

12  and the Tourette's can play into or set the stage for these

13  kind of behaviors.

14  Q.  Doctor, did there come a time where you learned that

15  Mr. McWaters had been accused and, in fact, has accepted

16  responsibility for what we term as post-plea misconduct?

17  A.  Yes.

18  Q.  And are you familiar with that, sir?

19  A.  I am.

20  Q.  Do you have an opinion as to how his diagnosis may have

21  played a role in his post-plea actions?

22  A.  Yes.

23  Q.  And would you please tell us what your opinion is it on

24  that.

25  A.  That's very consistent behavior with the impulsivity that

1    you see in ADHD and the inability to anticipate what may happen

2    as a result of one's behavior.  So to not consider that that

3    could put him in even worse condition or situation and lose the

4    benefit of what he'd already gained is typical of individuals

5    with ADHD.

6          If he had a long criminal history or any criminal

7    history or a history of disruptive behavior, then you would

8    certainly say, well, maybe he has a different disorder, like

9    he's antisocial or he enjoys breaking the law, or tweaking the

10   noses of authority.  But he doesn't have that history.  So it's

11   more likely attributable to him not considering the future

12   consequences of his behavior and levels of immaturity that

13   after that resulted him acting in a self-destructive way.

14   Q.  Okay.  You said that Mr. McWaters tried to minimize his

15   symptoms when you were conducting your clinical evaluation of

16   him.

17   A.  Yes.

18   Q.  Could you give me examples of how he did that?

19   A.  Sure.  He minimized and denied at such a high level.  On

20   the MMPI-2 he invalidated the test, which is difficult to do

21   with a 567-item test.  So that was one indication.

22          He also showed defensiveness in the clinical interview

23   in terms of denying any symptoms of depression, anxiety.  He

24   minimizes -- he's almost embarrassed by his symptoms, by his

25   continued symptoms.

1          He still displays some symptoms of -- he has a

2    subvocal tick that he does in terms of clearing his throat.  So

3    he stands out.  He's noticeable.  If you pay attention and

4    listen to him, he's noticeable.  So he tries to -- in order to

5    fit in, he tries to minimize and deny those things.  And he did

6    that consistently throughout the interview.

7    Q.  Dr. Brandon, do you have an approximate number of how many

8    evaluations, forensic evaluations for criminal cases that

9    you've conducted?

10   A.  I do.

11   Q.  And how many would you say?

12   A.  At last count it was over 15,000.

13   Q.  How often do you see the actions that Mr. McWaters

14   exhibited in terms of minimizing, how often do you see that in

15   the criminal context of evaluation?

16   A.  It's extremely rare.  It is -- in terms of criminal

17   evaluations, I'd say if I've seen that ten times, that would

18   probably be a lot.  It's -- either a person is either telling

19   the truth or they're trying to appear as bad as they can for

20   some secondary gain, avoiding punitive sanctions within the

21   setting.  It's called malingering.  So it's extremely rare that

22   somebody minimizes or denies symptoms.

23   Q.  Okay.  Do you have, Dr. Brannon, a recommendation as to

24   what type of treatment may benefit Mr. McWaters and at the same

25   time help minimize the chances that he would engage in these

Direct - Brannon                      23

1   types of actions in the future?

2   A.   I do.

3   Q.   And would you please tell us about that.

4   A.   Sure.  If he was involved in some type of psychiatric case

5   management services where he was receiving medications for both

6   his Tourette's as well as his attention-deficit disorder,

7   reduce the symptoms of Tourette's and also be able to assist

8   him with his impulsivity and poor attentiveness.

9        If he was in therapy with someone who was trained in

10  the area of adult attention-deficient disorder to help teach

11  him better strategies and problem-solving skills and regulate

12  his emotions as well.

13       And if he was also attending recovery group meetings,

14  alcohol recovery group meetings.

15       All of those things would be beneficial to him but

16  reduce the risk of him recidivating.  You would put him into a

17  different theater, if you will, in terms on his symptom

18  patterns.  Maybe less of an impact on his behavior.

19       So if you were able to reduce or eliminate his

20  alcohol, medicate his symptoms, and get him therapy and

21  counseling where he can talk about his day-to-day conflicts,

22  you increase the probability that he'd perform at a better

23  level than he's performed that puts him here today.

24       MS. JHONES:  Okay.  I just need a moment, Your Honor

25  if I may.

Direct - Brannon                    24

1          THE COURT:  Certainly.

2    BY MS. JHONES:

3    Q.  Dr. Brannon, you indicated -- I think you used the term

4    that he can't put the brakes or he's unable to put brakes on

5    his actions --

6    A.  Yes.

7    Q.  -- or words to that effect.

8          Could you elaborate a little bit on that and explain

9    so that we can better understand how it is that Mr. McWaters

10   may have come to find himself where he does here today?

11   A.  You see that throughout his records.  And I would be

12   disingenuous to say I made up that description of ADHD.  It's a

13   very old description of ADHD.  And it really basically says

14   that it's an individual, as you see throughout his childhood,

15   you know, was disruptive in class, was a child who said things

16   without thinking, who did things without thinking a lot of

17   times.  If you follow that into his adult life, it's led him

18   some problems and difficulties in regards to not thinking or

19   anticipating what may happen.  So he lives in a world in which

20   one is usually more immature than their chronological age.

21   Some research by Dr. Russell Barkley says up to about

22   30 percent decrements in maturity levels.  So he's probably

23   been functioning at a much younger age in terms of his maturity

24   all the ways through, including now, and he does things without

25   thinking through, and especially if he's upset or stressed or

1    angry about something.

2    Q.  Are there certain things that may trigger the impulsivity,

3    the lack of control, or applying the brakes?

4    A.  Yes.  I mean, any situation where he's conflicted or

5    stressed or again angry about something or feels rejected in

6    some way.

7         And the thing about ADHD is that if you stop the

8    person before they did it and said should you do that and what

9    could happen, they could tell you.  They can give you the

10   answer.  But they don't consider that.  They don't think about

11   that.  What they do is they just think about what's in the

12   moment and what seems like a good idea to satisfy their

13   emotions in the moment.

14        MS. JHONES:  Okay.  Your Honor, I think I'll tender

15   the witness at this time.

16        THE COURT:  All right.  Ms. Gilbert, cross.

17        MS. GILBERT:  Thank you, Your Honor.

18                       CROSS-EXAMINATION

19   BY MS. GILBERT:

20   Q.  Good morning, doctor.

21   A.  Good morning.

22   Q.  I'm one of prosecutors assigned to this case.  I don't

23   think we've ever met.

24   A.  We have not.

25   Q.  Okay.  I want to ask you a couple things in really simple

Cross - Brannon                                    26

```
 1   layman's terms because I obviously have no background like you
 2   do.
 3              In regard to the diagnosis about Tourette's, okay,
 4   what does that actually mean?  My simple understanding is you
 5   sort of say things without being able to control that, right?
 6   A.  Yes.  It's a nervous system disorder that affects the basal
 7   ganglia of the brain.  It basically is ticks, motor and verbal
 8   ticks.  So a person may yell out.  Sometimes at the most
 9   extreme form, curse words.  They can't control.  It's inability
10   to be able to stop yourself from clearing your throat,
11   blinking, turning your head, grimacing, making some type of
12   involuntarily motor moment or verbal statement.
13   Q.  Does if translate to typing things?  Would you type
14   something?  Would it cause you to say nasty things on a
15   typewriter?  I'm sorry.  I'm showing my age.  On a computer
16   keyboard, would it cause you to type things?
17   A.  Well, it could, but it's unlikely.  It's not an explanation
18   for that.  So, I mean, it's more of an impulsive, in the
19   moment, under stress type of behavior as opposed to something
20   more thought out.
21   Q.  Okay.  And moving to the alcohol for just a moment.  You
22   said that possibly -- that it's self-medication, right?
23   A.  It's possible, yes.
24   Q.  And so one might think, okay, well, maybe he just got drunk
25   and did these things.  Okay?
```

Cross - Brannon                               27

1              So my question is:  If your behavior is consistent

2    when you're out of prison and when you're in prison --

3    hopefully there's not alcohol there.

4    A.   Correct.

5    Q.   If the behavior is the same, could we probably rule out

6    alcohol leading to this kind of behavior?

7    A.   Yes.  And he doesn't report that either.  So when you ask

8    him that, he doesn't report it being alcohol-induced.

9    Q.   Okay.  So let's go to sort of the final piece, which is the

10   ADHD.  It's a pretty common diagnosis, isn't it?

11   A.   Well, some people would say too common.  But, yes, it's

12   diagnosed now more than ever because there's also adult ADHD.

13   So at some point or another, really depending on whose figures

14   you listen to, maybe about 15 percent may have some features or

15   forms of ADHD.

16   Q.   Okay.  So you would agree with me that there are plenty of

17   people that have this condition that do not commit crimes?

18   A.   Yes.

19   Q.   Plenty of people have this condition that don't threaten

20   people and send emails and letters and things like that

21   threatening people?

22   A.   Correct.  Yes.

23   Q.   And I think you even said yourself it doesn't explain the

24   behavior.

25   A.   No, it just sets an environment that's rich for problematic

1    behavior, but it doesn't cause you.  There's not a one-to-one

2    correspondence.  It doesn't cause you to engage in criminal

3    activity.

4    Q.   I think you said a moment ago in regard to the question

5    about putting on the brakes, you do things without thinking.

6    A.   Yes.

7    Q.   Okay.  Sort of spur of the moment, impulsive do something.

8    A.   Or you -- that's one possibility.  Or you do a chain of

9    things that you think about but they're impulsive in that you

10   don't consider the consequences of them.

11   Q.   Okay.  Now, I don't know how well you know the facts of

12   this case.

13   A.   Pretty well.

14   Q.   Okay.  The fact that he didn't use his own name, that he

15   hid his identity?

16   A.   Yes.

17   Q.   Okay.  And pretty well thought out stuff?

18   A.   Yes, I would agree.

19   Q.   Okay.  The fact that he is framing someone else, using

20   someone else's name, isn't that inconsistent with doing things

21   without thinking?

22   A.   No, you can do that with ADHD.  And essentially what

23   happens is you do those things without considering the

24   consequences of those things.  If you do enough of those

25   things, you have to know that that's kind of an immature,

Cross - Brannon                          29

1   fantastical world to live in, to think that you can do all of

2   those things and not have some consequence at some point,

3   especially when you're in an incarcerated setting having

4   already gotten a deal.  So it isn't just the impulsive do it as

5   I think about it.  It's also doing it without any

6   consideration, realistic consideration of what could happen.

7   Q.  Okay.  Would you consider, you know, getting charged or

8   arrested as a realistic consideration?

9   A.  Yes.  Sure.

10  Q.  Okay.  So someone sort of hiding their tracks or covering

11  or trying to send law enforcement in another direction would be

12  thinking about the consequences, wouldn't it?

13  A.  It would certainly be thinking at some level about being

14  caught or being punished.  If you still engage in the behavior

15  though, then that would be what's problematic, more consistent

16  with the ADHD.

17  Q.  Well, you get away with it, right?  A normal criminal who

18  gets away with something becomes more embolden and continues

19  the behavior, right?

20  A.  Sure, but he's not a normal criminal.  He doesn't have a

21  history of that behavior.  He doesn't have that criminal

22  thinking history.  So that's the only reason I would consider

23  this kind of an isolated circumstance.

24  Q.  Okay.  Would you agree with me at some point though the

25  steps that one took or that he, Preston McWaters, took in this

1   case need to be considered when you're thinking about whether

2   it's impulsive or not?

3   A.   Sure.   Absolutely.   Yes.

4   Q.   So someone who goes to the bank and withdraws cash, then

5   goes to Walmart and pays for a prepaid -- what's referred in

6   our world as a drop phone, right?

7   A.   Yes.

8   Q.   You don't have to give a name; you don't really have to

9   give any information, right?

10  A.   Yes.

11  Q.   You buy that.   Then you open up a Twitter account in

12  somebody else's name and you test it to see if it works, and

13  then you begin to write things on Twitter over really weeks

14  into months, right?   This is in -- December 11 I think is when

15  he buys the first phone.   He puts up the first Tweet 16th,

16  17th.   So he's waiting days in between.   Would you think these

17  are all facts you need to consider when you're determining

18  whether he's thinking about the consequence of getting caught?

19  A.   Yes, I do.

20  Q.   Okay.   And then days continue after a Twitter account, then

21  he opens up a Facebook account?

22  A.   Yes, I'm aware of that.

23  Q.   Okay.   And then he continues to pick targets, right?   Palm

24  Beach International Airport he sends something to.   Eventually

25  he sends to a hospital in Palm Beach.   And this continues until

Cross - Brannon                          31

1  March, right?  Would the time period also be significant to you

2  in terms of the planning and the thinking it through?

3  A.  Yes, it could be.  But in terms of not only impulsive

4  behaviors, different sets of impulsive behaviors, but also

5  attempts to conceal.  So it's really both.  It argues both

6  ways.  ADHD doesn't mean you can't plan.  It just means that

7  you're less likely to do that.

8  Q.  Less likely to plan?

9  A.  Sure.  Less likely to be the first thing in your mind.  You

10 tend to live in the moment.

11 Q.  Okay.  And how does sort of intelligence play into this?

12 Someone that's really pretty smart and that knows their way

13 around a computer, that knows their way around the Internet,

14 how would that play into it?

15 A.  You'd have more skills and ability the smarter you are.

16 That's probably the explanation of how he gets through high

17 school despite the fact that he has severe ADHD.  So if you're

18 smart, you may not perform up to your levels but you can still

19 do a lot more than someone who, let's say, is of less

20 intelligence who has ADHD.

21 Q.  Do you know what an IP anonymizer is?

22 A.  No, I don't.

23 Q.  Do you know that when you do something on your computer,

24 you have an Internet protocol address that --

25 A.  Yes.

Cross - Brannon                          32

1  Q.   Basically, it's the ID to your computer or your device or

2  how you're accessing the Internet?

3  A.   Yes.

4  Q.   So if we want to trace someone, we trace them by their IP

5  address?

6  A.   Yes.

7  Q.   Okay.  If you don't want to be traced, you use an IP

8  anonymizer so that we can't figure out who you are.  Okay?

9  A.   Okay.

10  Q.   My question is:  Someone who learns about this service,

11  pays for an app on their phone, an application on their phone

12  to use as a virtual private network, a VPN or an IP anonymizer

13  to cover their tracks, doesn't give any personal

14  identification, buys a phone in Athens, Georgia, but then asks

15  for a 561 area code to make it look like it's Palm Beach, these

16  are all things that are consistent with thinking about not

17  getting caught; wouldn't you agree?

18  A.   I would, yes.

19  Q.   Okay.  You said a moment ago about -- you were asked about

20  it's rare that someone minimizes.  You said maybe ten cases, I

21  think, in the thousands that you've done.

22  A.   Yes, that's correct.

23  Q.   What do you think that means?

24  A.   That means he's had a lifestyle in which people have noted

25  his symptoms, he stood out, especially because of Tourette's,

Cross - Brannon                          33

1   he stood out because of his symptoms, he's embarrassed by those

2   symptoms, and he's doing the best he can to fit in.

3   Q.   Okay.  To not stand out?

4   A.   Correct.

5   Q.   To sort of try to model his behavior what he thinks is sort

6   of what he should be doing?

7   A.   Well, to try not to display any symptoms, to not stand out

8   so that he can fit in with other individuals without making

9   noises or grimacing or doing things that make him stand out.

10  It's embarrassing usually to people who have neurodevelopmental

11  disorders.

12  Q.   Okay.  Does it affect your ability to write at a certain

13  speed, like sort of a normal speed to write cursively or in

14  print?

15  A.   No.

16  Q.   Okay.  So I don't know if you were made aware of this, that

17  we through a subpoena requested a handwriting exemplar.

18  A.   I am aware.

19  Q.   And had him write basically similar things that were on the

20  envelope and things like that.

21  A.   Yes.

22  Q.   Okay.  For each of the examples, I think there were three

23  or four different things, it was written 15 times.

24  A.   Okay.

25  Q.   So therefore that's 60.  Okay?

Cross - Brannon                          34

```
 1              Would it take you eight hours to write those lines

 2   because of any of these symptoms you've talked about?

 3   A.   No.

 4   Q.   Is there an explanation why it would take him eight hours?

 5   A.   None that's related to my area of specialty, which is those

 6   disorders.

 7   Q.   Okay.  Or it's consistent with trying to write something

 8   deliberately or trying to conceal your behavior?

 9   A.   I didn't talk to him about that, but that certainly is a

10   possibility, sure.  But it would be unrelated to his mental

11   health symptoms.

12   Q.   How about framing someone else?  Does that somehow tie in

13   or is explained by any of these diagnoses?

14   A.   Only if it was done in an immature way or done in a way

15   that revealed his tracks or put him in a position where it was

16   easily discoverable.  That would be the only way it would

17   possibly be related.

18   Q.   Okay.  And something in your report.  You wrote "overly

19   virtuous".

20   A.   Yes.

21   Q.   What does that mean?

22   A.   That's just a description that the test, the MMPI-2 uses to

23   describe his response style.  "Overly virtuous" is a denial of

24   any kind of problems or difficulties on the test.  So you're

25   denying symptoms of mental health problems.
```

Cross - Brannon                                    35

1   Q.   Okay.  So it doesn't really mean virtuous in the sense of

2   truthful; it means I'm trying to write what I think I should

3   write if I didn't have this condition?

4   A.   It would be an inappropriate application of that term.

5   It's just a -- it's a term of art used in the MMPI-2 that says

6   that he's denying problems, even problems that people commonly

7   say.  Like I sometimes had thoughts that I don't want to speak,

8   things like that.  So someone being overly virtuous would say,

9   no, I've never had a thought like that.

10  Q.   So set aside what we think the common meaning is and just

11  take that meaning?

12  A.   Sure.  Again, and it's in the MMPI-2 section.  So it's just

13  a term of art.

14  Q.   So I think the million-dollar question that we all want to

15  know is, how do we prevent him from committing future crimes?

16  A.   Well, we can just reduce the likelihood.  We don't have

17  anything in psychology as powerful enough to make a guarantee,

18  but we know that if someone's not using alcohol, if somebody is

19  having medication treating their symptoms of their disorders,

20  and if they're in regular therapy, participating in regular

21  therapy, we reduce the probability that they'll engage in the

22  same kind of behaviors again.  We've changed the constellation

23  of their environment.  So we have better odds at that point.

24  But we never have a guarantee.  We don't know how motivated or

25  compliant the person would be with treatment, those kinds of

Redirect - Brannon                                    36

 1  things.  So we don't know that.  That's somewhere in the

 2  future.

 3  Q.  And he at one point in his life was in regular counseling

 4  and on medications, correct?

 5  A.  Yes.  He was removed by his farther, though.  It was in his

 6  late childhood.  He was removed by his father who didn't want

 7  him on those substances.

 8  Q.  So as an adult was he ever treated?

 9  A.  No.  He minimizes his symptoms.  He's trying to fit in.  So

10  he doesn't want to label or identify himself.  So he does what

11  most people with that condition do, is they try to fit in.

12  Q.  And he certainly never sought help for what he knew his

13  condition was?

14  A.  Correct.

15          MS. GILBERT:  If I may have just a second, Judge?

16          THE COURT:  Yes, ma'am.

17          MS. GILBERT:  Nothing further.

18          THE COURT:  Thank you.

19          MS. JHONES:  Just a couple of questions, Your Honor.

20          THE COURT:  Sure.

21                      REDIRECT EXAMINATION

22  BY MS. JHONES:

23  Q.  Dr. Brannon, what level of intelligence would you say

24  Mr. McWaters is functioning at?

25  A.  It's noted in the records that he was functioning in the

Redirect - Brannon                          37

```
 1   average range.  That's the last time it appears any IQ measures
 2   were done.  I would say he functions in the high average range.
 3   I'd say he's smarter than that.
 4   Q.  Is there an inconsistency between a person who is either
 5   above average intelligence or very intelligent?  Is there an
 6   inconsistency between that and the diagnosis of adult ADHD?
 7   A.  Yes.  What happens is you can't live up to the potential of
 8   your average to high average intelligence because you tend to
 9   function in an immature way.  You see the world in more of a
10   fantastical way as opposed to a realist way.  So it's unlikely
11   you would be able to fully benefit from the intelligence that
12   you have.
13   Q.  And, doctor, you have been able to read some of the threats
14   that were made in this case --
15   A.  Yes.
16   Q.  -- have you not?
17        Would you have an opinion as to whether or not the
18   characterization of the threats would fall into the fantastical
19   category or immature category?
20   A.  They certainly seem to, especially when you speak to his
21   mother and find out that he doesn't have things like
22   fascination in weapons or makes threats or things like that.
23   There's no history of him doing that.  So it seems to be pretty
24   isolated.  So it appears to me, although you're always careful
25   about making these type of statements, but it appears at least
```

Redirect - Brannon                      38

1   to be considering his entire history somewhat fantastical.

2          MS. JHONES:  Thank you, doctor.

3          THE COURT:  Do you have an opinion as to the source of

4   Mr. McWaters' anger?

5          THE WITNESS:  I do, Your Honor.

6          THE COURT:  What is that?

7          THE WITNESS:  It is the rejection in the relationship,

8   feeling rejected or feeling cast aside was his first real

9   relationship, if you will, or at least his view of a real

10  relationship.  And I think he's very unskilled and

11  inexperienced in terms of relationships.  He's been mostly

12  rejected throughout the course of his life.  So it's that type

13  of rage that he's never really spoke about or been able to

14  accept, and his behavior has followed in line with that.

15         THE COURT:  And getting back to a question that

16  Ms. Gilbert asked you, do you have an opinion as to whether

17  Mr. McWaters is a danger to the public?

18         THE WITNESS:  Your Honor, I did not do a formal risk

19  assessment, a danger assessment in this case.  He has no

20  history of violent or aggressive behaviors that I'm aware of or

21  that were noted in any reports or discussion with his mother.

22  So the probability is likely low, although I would not want to

23  be definitive with the Court having not done a risk assessment.

24         THE COURT:  Okay.  Any other questions?

25         MS. JHONES:  No.

Redirect - Brannon                    39

1          THE COURT:  Thank you, doctor.

2          THE WITNESS:  Thank you, Your Honor.

3      (Witness was excused.)

4          THE COURT:  Ms. Jhones, will there be other mitigation

5  that you wish to offer?

6          MS. JHONES:  No more evidence.  Just argument, Your

7  Honor.

8          THE COURT:  Okay.  Did your client wish to be heard?

9          MS. JHONES:  May I have a moment, Your Honor?

10         THE COURT:  Tell you what, let's do this.  Let me give

11 the government a chance to offer any evidence that they wish,

12 and I'll give your client the last word.

13         So Mr. Fels, any evidence the government wishes to

14 offer?

15         MR. FELS:  Your Honor, I don't think that there's

16 anything tremendously in dispute.  I would like to mention a

17 couple of things that pertain to the post -- there is some

18 evidence.  We'll weave it into the argument a little bit later.

19         THE COURT:  All right.

20         MR. FELS:  The evidence that I would proffer to Your

21 Honor is that in this particular case the first letter that was

22 submitted from FDC never made it out into the mails.  And what

23 was done is a stamp that had been previously used, and so

24 therefore the lines were marking over the stamp showing that

25 it's already been through the US mails, was affixed by

1   Mr. McWaters onto a plain envelope that purported to be from

2   Palm Beach County, that was the address of the victim

3   Mr. Meade, and was addressed to the United States Probation

4   Office.

5           Now, that letter was written in a very stylized

6   script.  We had a handwriting analyst take a look at both a

7   sample of Mr. McWaters' handwriting, which as Ms. Gilbert

8   alluded to took eight hours for Mr. McWaters to provide, and

9   they did a comparison.  And a couple of things came out of that

10  comparison.

11          One was that they believed that it was likely

12  Mr. McWaters; however, they couldn't be sure because there

13  appeared to be an intent in one of the two handwritings, can't

14  say which one, to mask the type of handwriting.

15          For example, and this was from my own and my agent's

16  observation, there were cursive Fs and Gs that were very

17  stylized.  When we asked Mr. McWaters to provide a cursive F

18  and G, he simply wrote out a block F and G.  Now, whether

19  that's how he writes Fs and Gs normally and he did it overly

20  stylized in the initial letters, we have no way of knowing.

21  But what it does show, and as I will say in argument later, is

22  an intent to conceal which is inconsistent with Dr. Brannon's

23  primary conclusion that there was some sort of inability to

24  understand consequences.

25          The second point that I would make is that this letter

1    never -- this first letter never did makes it into the mail.

2    What Mr. McWaters did, very wisely, used that stamp that had

3    already been used in the mail, so it appeared that the letter

4    in fact had been in the mails, and he affixed a yellow sticky

5    note that says "delivered to the wrong address."  He then goes

6    into the prison and presents this envelope as if he had

7    received it in the mail.  Of course, there's absolutely no

8    explanation how the letter from Palm Beach County addressed to

9    a probation office ever could have wound up in the prison, but

10   that's obviously another story.  This was all part of a very

11   elaborate ruse in order to frame Mr. Meade yet again.

12           The second letter in this case, also very stylized

13   written, that actually did make it out into the mails.  We know

14   that it was never sent from Palm Beach County because the code

15   on the mail showed that the mail never left Miami-Dade County.

16   Again, the handwriting analysis shows a lot of similarities

17   between the two.  But again, no concrete, a hundred percent

18   match.  The only thing that there was a concrete, hundred

19   percent match was the little yellow sticky on the first letter

20   saying "delivered to the wrong address."

21           And that's all the evidence that we have to present,

22   Your Honor.  We can proceed to argument, if you would like.

23           THE COURT:  Well, let me give Mr. McWaters a chance to

24   be heard, and then I'll hear argument.

25           MS. JHONES:  Your Honor, would you like him to stand?

```
1            THE COURT:  However he feels comfortable.

2            THE DEFENDANT:  First, I would like to thank Mr. or

3   Dr. Brannon for his testimony, even though I believe that he

4   has left.  I both value and respect his professional opinion,

5   and I am not going to argue with anything he said.

6            As for what I would like to say, I was asked to take

7   some time and write down my own thoughts and feelings as to why

8   I did what I did, and I can only tell you from my point of view

9   this is the letter that I wrote.  Okay.

10           To who it may concern:

11           My name is Preston Alexander McWaters.  I am currently

12  a federal prisoner convicted of the crime of communication of

13  threats over the Internet.  The following is an honest and

14  accurate testimony of my actions to be used to give the Court

15  and the public an explanation and apology for the crimes I was

16  involved in.  This is not to be used as any form of obstruction

17  of justice or to be taken out of context.

18           In November of 2015 I, Preston McWaters, received

19  several letters of mal intent, some of which contained threats

20  to myself and members of my own family, in order to gain my

21  compliance with carrying out certain criminal acts.  I was told

22  that if I did what I was told to do, my family would remain

23  safe.  Also to deter me from informing authorities of my

24  situation, I was told I was being followed and would only end

25  up getting myself or my family killed.
```

1        Along with these letters I was given specific

2   instructions of various targets, businesses, and individuals,

3   and when and how to threaten them in exchange for money.  I

4   agreed to comply with what I was being told to do out of fear

5   and loyalty to the few people I loved dearly.  I must state

6   that I hold no hatred or ill will toward anyone hurt by these

7   crimes and would not wish any of them true harm.

8        In the matter of my case, I take full responsibility

9   on my part for my involvement in the crimes I pled guilty to.

10  I humbly ask that the powers to be take weight in the account

11  that I only acted out of fear and did what I felt was in the

12  best course of action to protect those people I love.  Still

13  that being said, it does not excuse me of my involvement in

14  these crimes and I fully understand that punishment must be

15  dealt to the fullest extent of the law.  I humbly accept

16  whatever punishment that the Court and federal government sees

17  fit to impose upon me.

18       Lastly, but not least, I would like to apologize for

19  my actions to those who were hurt by what was done, and I am

20  truly sorry in my heart.  Even if done for a good reason, a

21  crime was still committed and people were hurt.  Therefore, I

22  do not expect to get off easy, nor do I want to.

23       THE COURT:  Mr. Fels, I'll hear from the government

24  first and then the defendant.

25       MR. FELS:  Your Honor, this is a bit of a curve ball,

1    to say the least.  Obviously, at no point up until 90 seconds

2    ago had we any sort of inkling that there was going to be some

3    sort of a pseudo duress or duress defense in this case.  Never

4    presented to us.  And it's not consistent with the facts, Your

5    Honor.

6            The places that Mr. McWaters targeted were places that

7    are connected to the two people in this love triangle.  It

8    makes absolutely no sense.  Of course, you know, we would be

9    more than happy to look into the matter, but I think I speak

10   for the special agent and my co-counsel in saying I think the

11   likelihood is that this is yet another attempt to avoid

12   consequences.

13           THE COURT:  Well, he's entered a guilty plea.

14           MR. FELS:  I understand, Your Honor.  But let's talk

15   about where we are at this particular juncture.

16           The parties have agreed to a guideline sentence, Your

17   Honor.  Ms. Jhones is going to ask for a 36-month sentence --

18           MS. JHONES:  37.

19           MR. FELS:  Sorry.  37-month sentence.  We will ask for

20   a 46-month sentence.  And we believe the high end is warranted

21   in this case based on the 3553 factors which this Court has to

22   consider.

23           The first of those considerations is the nature and

24   circumstances of this particular offense, Your Honor.

25           I would say that -- and I think I speak for certainly

1    the case agent, that this is probably the most devious crime

2    that I've been involved with in my ten years and the agent's 20

3    years of law enforcement.  And why do I say that it's

4    particularly devious?  Because of the efforts to conceal,

5    because of the elaborate efforts to construct what was very

6    nearly the perfect crime.  We throw that term around a lot, but

7    this is really about as close as you could have come to a

8    perfect crime.

9         Mr. McWaters mined the Internet for information on his

10   victims, such as the victim's employer, whom he later

11   threatened in the victim's name, the victim's home address,

12   which he used in his threats in order to try to get his victim

13   incarcerated and arrested and out of the picture, and also in

14   order to convince law enforcement that it was the victim and

15   not him who was posting these various threats.

16        As Ms. Gilbert indicated in her cross-examination,

17   Mr. McWaters purchased throwaway phones, basically phones that

18   you're not required to provide your name, address, credit card

19   number to register with Twitter in order to start posting the

20   initial threats in order to frame his victim.  And not only did

21   he pay for these phones in cash, but he registered the phones

22   in his victim's area code here in Florida even though he bought

23   the phones in Georgia.  Again, in a very elaborate way to try

24   to frame his victim.

25        He used a prepaid card instead of his own credit cards

1   in order to buy reports on his victim, public information on

2   the Internet.  He used an Internet anonymizer and paid for that

3   service using a prepaid card in order to mask where he sent

4   those Tweets from.

5           Contrary to Dr. Brannon's conclusion, his conduct in

6   this case, regardless of what diagnosis he may have, does not

7   show poor anticipation of future consequences.  Quite to the

8   contrary.  It shows an excellent anticipation of the various

9   consequences and making very deliberate steps to avoid being

10  caught.

11          Indeed, had he not made the single mistake of

12  personally walking into the Walmart to buy those throwaway

13  phones, which allowed us to see video of him actually getting

14  those phones, he likely would still be out in the streets

15  continuing to threaten various places of commerce and schools.

16          THE COURT:  Let me ask you this.  In terms of the

17  3553(a) factors, what weight do you give to the mental health

18  component to this case?

19          MR. FELS:  Your Honor, I would not give very much

20  weight.  And the reason is, as Dr. Bannon -- sorry, Brannon

21  explained --

22          THE COURT:  I think you're confusing him with somebody

23  in the incoming administration.

24          MR. FELS:  It's possible, Your Honor.

25          So I wouldn't give a lot of weight at all.  As

1  Dr. Brannon conceded, a lot of the explanations for this

2  particular crime just don't fit the particular diagnosis.  The

3  Tourette's didn't have an effect.  The alcohol didn't have an

4  effect.

5        Where you might expect, for example, an individual

6  with ADHD, and there are many out there, to commit random quick

7  acts of violence, aggression because they can't control their

8  anger, they can't control their personalities, this was a very

9  slow and deliberate game.  It wasn't a game, Your Honor.  It

10 was actually a very serious, serious set of crimes with very

11 serious consequences.  But every little step was thought out

12 with the exception of that lone step which was that he went in

13 to buy phones himself exposing his face to video.  But this was

14 an incredibly deliberate step.  I would not give any sort of

15 consideration.

16       First of all, I believe that the guidelines themself

17 say that unless some sort of mental health condition is really

18 outside of the range of the ordinary, it shouldn't be given

19 consideration.

20       THE COURT:  Wait, wait, wait a second.  We're not

21 talking about a departure.  We're talking about consideration

22 of the 3553(a) factors, the history and characteristics of the

23 defendant, which would include mental health issues.

24       MR. FELS:  That's correct, Your Honor.  He wouldn't be

25 entitled to a variance.  But, obviously, it would be a factor

1   based on his history and characteristics.  We just don't think

2   it's --

3        THE COURT:  Well, it could be a variance.  Depending

4   on what weight you gave to that factor, it could create a

5   variance.  But I'm not suggesting that.  I'm just making sure

6   that the record is clear as to what the Court is considering.

7        MR. FELS:  I understand, Your Honor.

8        I would also say that his decision to commit

9   additional acts while he was in prison and already had pled

10  guilty to this case also militates for a high-end sentence.

11       And we can throw around all sorts of theories as to

12  why he would have done this.  I think the most obvious, the

13  Occam's razor principle, the most simplest explanation is he

14  wants people to believe, maybe himself, that whoever actually

15  did this is still out there and it might mitigate his sentence,

16  it might mitigate his culpability.  In effect, it really is a

17  form of obstruction.  We're not seeking obstruction of justice,

18  but it really is a form of obstruction, the most legitimate

19  explanation for why he continued to send out these letters.

20       Someone else is sending out letters that are very

21  similar in content and maybe the prosecutor or the Court would

22  at least pause before sentencing him to a high sentence in

23  prison.

24       Now, I think in an effort to achieve his goal

25  Mr. McWaters, again as I pointed out earlier, engaged in a very

1    elaborate and devious method of trying to frame Mr. Meade.  He

2    used that stamp that had already been used in a prior mailing

3    to make it look like this letter had, in fact, been in the

4    mails.  He wrote the little handwritten note saying delivered

5    to the wrong address so that way he would essentially mask the

6    fact that this letter originated at the Federal Detection

7    Center in Miami instead of in Palm Beach, which is what he

8    wanted everyone to believe.

9            He also used this false stylized script to write the

10   letter.  And when he was asked to write a writing sample --

11   this is something that could have taken several hours, we would

12   imagine, but it wound up taking eight hours as he slowly and

13   deliberately wrote every single letter.  And I believe

14   actually, just to correct the factual record, there were 76

15   examples, not 60.  But still eight hours.  It's consistent with

16   the handwriting examiner's conclusion that their appears to be

17   some sort of intent to evade, some form of test.

18           So, Your Honor, we would say that a sentence in the

19   high end is militated by the nature and circumstances of this

20   offense.

21           Another one of the factors that's also critical here

22   is recidivism, is whether Mr. McWaters will continue to commit

23   crimes.

24           Now, typically we don't have a situation between the

25   time that an individual pleads guilty and he's sentenced to

1   observe whether that individual will continue to commit crimes.

2   So we are left as a judge, as prosecutors, defense attorneys --

3        THE COURT:  But you've got a defendant before the

4   Court who's 26 years old who's never, never been arrested.

5        MR. FELS:  That's correct, Your Honor.

6        THE COURT:  And you're concerned about recidivism.

7        MR. FELS:  I certainly am for two reasons.  One is

8   because I know that he understands that he is very good at what

9   he does, which is committing crimes and structuring criminal

10  activity, and that he can learn from the lone mistakes that he

11  made, really the one mistake that he made and get away with

12  them in the future.  And, number two, we know it's not a risk

13  of committing the same crime.  He's already done it.  He has

14  already committed the same crime again while in custody.  If he

15  shows so little respect for this Court, for the system that he

16  would commit a second crime while awaiting sentencing, I think

17  that speak volumes as to what he would do once he was out.  I

18  think those two factors in this case are very strong factors

19  militating for a high-end sentence.

20        Now, as for the need for treatment, that is one of the

21  other factors, Your Honor, and I think all of the treatment

22  that Dr. Brannon recommended, the counseling that is available

23  in prison, the medication that's available in prison, these are

24  all things that don't one way or the other move the needle on

25  what the amount of sentence is.  If anything, Mr. McWaters,

1   since he seems to be resistant to the idea that he needs help,

2   might need more time in therapy to try to accomplish the goal

3   of preventing future crimes, Your Honor.

4           And with that, Your Honor, we rest.

5           THE COURT:  All right.  Thank you, Mr. Fels.

6           Ms. Jhones, rebuttal.

7           MS. JHONES:  Your Honor, I want to start by saying

8   that I have nothing but the utmost respect for my opposing

9   counsel, both Mr. Fels and Ms. Gilbert.  And I don't think the

10  United States could be better represented.  I think that

11  they've dropped the ball on this one.

12          First of all, with respect to Mr. Fels' proffer to the

13  Court.  As the Court knows, I moved for a short continuance.

14  This has been a challenging case for me.  I came into it late,

15  and there were a lot of documents to review.  And I provided --

16  I don't know if the Court knows.  I don't think I've mentioned

17  this.  But I have over 220 or 250 pages of medicals.  I gave

18  them all to the government.

19          We have documents here, progress notes from

20  Dr. McLemore, the psychiatrist that's been treating

21  Mr. McWaters since he was five years of age.  He has, the

22  documentation that I gave to the government, documents, and

23  that I gave to Dr. Brannon, documents, treatment, counseling,

24  and medication, including Haldol, an antipsychotic, one

25  milligram of Haldol for years, because of his fantastical

1  thoughts when he was a child.  He received Haldol until 2005 --

2  again, the government has these documents -- when he was 15.

3  He has always lived with the mother.  Ms. Fellabaum is

4  present in court.  She came from Athens, Georgia, to be here in

5  support of her son.  She has always been very attentive to her

6  son.  The father is an alcoholic.  The father's parents are

7  alcoholics.  The paternal grandfather committed suicide.  All

8  of this is contained not within a report that Dr. Brannon

9  formulated in the past two months but since 1996 when this

10  young man was five years of age.

11  The mental health component to this case is

12  undisputed.  Mr. McWaters --

13  THE COURT:  Well, let me ask you this.  Isn't the

14  mental health component negated by the degree of planning in

15  this case and also negated by the fact that Mr. McWaters

16  essentially commits the same crime a second time after being

17  arrested?

18  MS. JHONES:  Your Honor, I think that Dr. Brannon

19  addressed that.  There is -- you can be very, very smart.  And

20  Mr. McWaters is above average intelligence at a minimum.  You

21  can be very smart and still -- and you can be motivated by --

22  he was motivated by this rejection.  This was his first love

23  interest.  And it was focused on this individual Mr. Meade who,

24  in essence, stole his girlfriend, if you will, in the mind of

25  Mr. McWaters.

1        I'm not justifying it, Your Honor, but I think -- and

2   as Dr. Brannon said, we don't have a crystal ball.  Mental

3   health is a complicated thing.  But the fact that he pursued it

4   and he pursued it for a long time and he planned it does not

5   negate the fact that it was fueled by his rejection which in

6   terms is related to his organic dysfunction.  They're not

7   isolated, Your Honor.  Yes, he could plan this, and yet it

8   still could be an impulsive act in the sense that once -- he

9   couldn't put the brakes, as Dr. Brannon said.  He was bound and

10  determined to do this.

11        Now, he pleads guilty.  Starting off at 27 to 33

12  months of incarceration, he would be out of here in less than

13  two years.  And what does he do?  He shoots himself in the foot

14  once again.  And now he has purchased for himself an additional

15  ten months for starters.  So instead of looking at 27 months at

16  the low end, which was called for per the plea agreement, the

17  government agreed to the low end in the plea agreement, they

18  factored the low end into the acceptance of responsibility

19  prong of matters, and of course they are no longer obligated to

20  do that because Mr. McWaters shot himself in the foot once

21  again, and so he bought himself an additional ten months'

22  incarceration.

23        Now, I am here standing before the Court arguing in

24  favor of the low end which basically we're arguing about nine

25  months.  And the question I have to ask, Your Honor, is maybe

```
 1   the government is completely right.  They're speculating now.

 2   And to an extent so is the defense.  We don't know because this

 3   is so unusual.  It is so out of character.

 4        What isn't out of character is the documented history

 5   of mental illness.  What isn't out of character -- and I have a

 6   few letters that I want to read from his siblings, parts of the

 7   letter that I had not been able to submit to the Court but I

 8   did gathered from family members.

 9        This was a young man who was gainfully employed.  He

10   started Dunkin' Donuts.  His older brother Michael, who also

11   stuffers from mental illness, Michael is also -- not also.

12   Michael is an alcoholic.  Michael has mental health issues.

13   Michael has attempted to take his life on numerous occasions.

14   Michael, Jaime, and Preston that share mom and dad are three

15   siblings that have mental health issues.

16        This gentleman -- Michael got Mr. McWaters his job at

17   Dunkin' Donuts, as is documented in the PSI.  In 2014, when he

18   went to work at Dunkin' Donuts, this is where he met Devon

19   Kenny, the victim in this case.  And they got along very well.

20   They were inseparable.  Devon didn't want to have anything else

21   to do with him.  Mr. McWaters was fired from Dunkin' Donuts.

22   But this all happened from 2014 to 2015 that -- I believe it

23   the first letters were sent in February or March of 2015.  This

24   is -- this happened in a very short period of time.

25        And after Mr. McWaters was fired from his job at
```

1    Dunkin' Donuts, he immediately got a job at the University of

2    Georgia in the food service.  By all accounts he worked there,

3    he paid his taxes, he was always prompt to his job.  Every

4    other aspect of his life, Your Honor, Mr. McWaters has acted in

5    a law-abiding way.  He's done what he's supposed to do,

6    especially when he's been under the guidance of his mother.  He

7    moved -- after these actions occurred, after he had the

8    restraining order, he went and he started living with his

9    mother.

10          If you look at the mental health history, and

11   Dr. Brannon has documented some of it in the five-page

12   forensics, when Mr. McWaters -- from the age of five until the

13   age of 15, that he was in treatment, Mr. McWaters performed

14   well under treatment.  There came a time -- after he went to

15   live with his dad he started drinking.  Whether that was for

16   self-medication purposes or what have you, I am not sure, Your

17   Honor.

18          But what is clear here is that for someone who was so

19   devious, as the government has characterized him, devious,

20   devious because he set the man who he perceived or the young

21   man who he perceived in his mind to have taken away his

22   girlfriend, a one-time act.  Yes, he did it and he was bound

23   and determined to see to it that Mr. Meade paid for taking his

24   girlfriend.  These are my words now.  This is my assessment of

25   what's behind his actions.

1    But what do we do about the fact that he's never done

2  this before ever?  What about the fact that he has siblings,

3  whether it's his two sisters, whether it's Joshua who is a

4  prosecutor in Athens, Georgia, who also wrote a letter who

5  has -- and his wife who have entrusted Preston with the care of

6  their children, whether it's Amanda, his sister, whether it's

7  Joshua, whether it's Michael, whether it's Jaime, all of these

8  siblings, the mother, all of these people -- and a best friend

9  that I do want to -- I actually want to reveal to the Court or

10 quote for the Court some of the things that his best friend of

11 12 years have said.  No one -- every one of them have said this

12 is so out of character.  I would never in a million years would

13 have believed that my brother, that my friend, that my son

14 could have done this.  Certainly we have absolutely no belief

15 that he could actually carry these threats out.  And that is

16 worth something, Your Honor.  It's worth a lot.

17    And the question becomes, what is another nine months

18 in prison going to do?  He has already got for himself ten

19 months.  So what is another nine months going to do?  Is that

20 going to remove the element of deviousness that the government

21 professes that this young man has?  I don't think so.

22    And if I can just quote a couple of these letters,

23 Your Honor, because again its not what we speculate but it's

24 what people that have known him his entire life say about him.

25    Joshua Vanderhood says the following.  And these

1  letters, Your Honor, have been addressed to Court.  But again,

2  I apologize.  I did not submit them to the Court.

3       My name is Joshua Vanderhood.  I am Preston Alexander

4  McWaters' brother.  I'm an Assistant District Attorney in

5  Jefferson Parish Louisiana.  However, I'm writing this letter

6  in a personal capacity and not as a representative of the state

7  of Louisiana.

8       It would be disingenuous if I were to give you the

9  impression that this letter is easy to write.  Preston's

10  actions completely blindsided not only me but my wife and the

11  rest of the family.  It caught me completely off guard because

12  I have never known Preston to be a violent person.  While his

13  actions may not have physically harmed anyone, his actions

14  caused unimaginable suffering to numerous citizens.  That

15  bothers me more than I can put into words.

16       Honestly, I do not believe that Preston is capable of

17  being physically violent with another individual because,

18  simply, I have neither witnessed nor heard of him being

19  physically violent.  I will be the first to state that these

20  actions show that my brother is troubled.

21       Someone who is rational does not commit such acts.

22  But I have seen his goodness in so many ways.  He is a loving

23  uncle to my daughter.  He has been a devoted son to my mother,

24  always helping her with what she needed as a single parent.  He

25  has been a loving brother to me.

1      Preston graduated high school years ago, but he was

2   discussing going to a local community college to get his

3   degree.  He was also hard-working at jobs that paid only

4   slightly above minimum wage.

5      It means a lot to the family that you are taking the

6   time to consider Preston's character as a whole before

7   sentencing him.  I know that such a holistic approach to

8   justice is not always contemplated, and I greatly appreciate

9   it.  This letter has been difficult to write, but I thank you

10  for reading it.

11     Brenna Posic Rock is a friend.  She's a critical care

12  line service coordinator at the Piedmont Athens Regional in

13  Athens, Georgia.  She was introduced to Preston by a friend's

14  younger brother.  She has known him for 12 years.  She

15  considers him as one of her closest and dearest friends.

16     I have come to know him as an honest and decent man

17  who loves his family and is fiercely loyal to his friends.  He

18  is someone with integrity and a compassionate heart going out

19  of his way to always help people in need.

20     Back in 2008 my family fell on hard times struggling

21  through job loss and foreclosure.  We only had one month to

22  find a new place to live, and Preston didn't hesitate to offer

23  his assistance showing up every day he could to help us pack up

24  and move an entire household of furniture, clothing, and

25  memories into trucks and storages units.

1          There were other occasions of a couple of years later

2     that he also helped condense those same storage units to help

3     us save money.  He not only donated his time and manual labor

4     but also his light-hearted sense of humor doing his best to

5     keep my family's spirits up in their time of need making jokes

6     about no longer needing a gym membership for a workout.

7     Preston became more than a friend to me.  He became a loving

8     brother to my family.

9          Preston's charity doesn't end there.  I've witnessed

10    multiple occasions when he has cared for and protected his

11    family and friends, whether he was defusing a situation between

12    two people that otherwise could have escalated to a fight or he

13    was finding a way to delicately inform a friend that her

14    boyfriend had been unfaithful to her.

15          When I learned of the charges brought against Preston,

16    I was shocked as they are not characteristic of the kind of man

17    I know him to be.  He has always been carrying and kindhearted

18    towards people, and I believe that he is a misguided -- this to

19    be a misguided prank whose purpose was more about getting

20    attention from a love interest than it was about causing harm

21    to anyone.

22          Thank you, Your Honor, for your time and attention.

23          And, your Honor, I'm not going to read the others, but

24    they have all have the same thing.

25          Amy Vanderhood, the sister-in-law.  Amanda McWaters --

```
 1              THE COURT:  I want you to read whatever you want to
 2    read, but I need to take a two-minute restroom break --
 3              MS. JHONES:  Okay.
 4              THE COURT:  -- or otherwise I've got a problem.
 5              MS. JHONES:  Okay.
 6         (Recess at 10:51 a.m.)
 7         (Call to Order of the Court.)
 8              THE COURT:  Okay.  Folks, please be seated.
 9              The record will reflect that Mr. McWaters is present,
10    represented by counsel.
11              Ms. Jhones, you may continue.
12              MS. JHONES:  Thank you, Your Honor.
13              Your Honor, this letter is from Amanda McWaters who
14    writes, I am Preston's sister.  We share the same biological
15    father.  He is the youngest of my three brother From Toni
16    Fellabaum and Mike McWaters.  I work as an underwriter in
17    professional risks for a wonderful insurance company.  I would
18    like to openly and honestly share with you my knowledge of the
19    person I know as Preston McWaters, my thoughts on why he might
20    be in this situation, and my condolences for those that were
21    affected by this.
22              I have tried to think of how and what to say over and
23    over.  It's just still so hard for me to even believe that my
24    letter brother did this.  The reason I find this hard to
25    believe is because the person that has been portrayed on the
```

1   news and by certain people is the opposite of the brother that

2   I have known and loved dearly for 27 years.

3       I understand that you have probably heard these

4   statements from family members before, but this is certainly

5   different.  You see, Preston is selfless, loving, sweet, soft

6   spoken, good-hearted, and lovable.  Out of my three brothers,

7   he has always -- he was always the one that was the peacemaker.

8   He wouldn't get involved in arguments between our brothers.

9   Parenthetically, Michael and Jamie.  He would listen to both

10  sides and never talk bad about the other.  Or when I would try

11  to talk to him about our brother Michael or whatever new sticky

12  situation he had gotten his himself into and what in the world

13  he was thinking, Preston would just shake his head quietly and

14  never say an ill word about Michael --

15      THE COURT REPORTER:  Counsel, can you please slow

16  down.

17      MS. JHONES:  So sorry.

18      THE COURT:  Somebody has an electronic device on at

19  counsel table.  It needs to be powered off.  If it's on

20  vibrate, it will impact the audio system.

21      Go ahead.

22      MS. JHONES:  Thank you, Your Honor.

23      Or when I would try to talk to him about our brother

24  Michael or whatever new sticky situation he had gotten himself

25  into and what in the world he was thinking, Preston would just

shake his head quietly and never say an ill word about Michael.

His love and selflessness is abundant.

One time I asked him to help me go get a Christmas

tree for my grandmother.  She was not related to Preston as she

was my mother's mom.  Preston didn't hesitate to help.  He went

to pick out a tree on a Saturday with me, helped me load it up

and carry it to my grandmother's house.  He could have split

and enjoyed his weekend like any other 20 something young boy

would do.  And instead he stayed and helped me decorate her

tree and house for Christmas.  When my grandmother tried to

give him some money for helping, he refused.

Preston is always willing to put others first and help

out.  He gave up two weekends in a row last year to help me

move from one apartment to another over an hour from where he

lived.  He didn't have much free time, but he got up and came

to Atlanta extremely early in the morning to help.  I could

always count on Preston to drop whatever he was doing to be

there for his friends and family when they needed him.

The last time I saw Preston was in December of 2015.

He was the only one of my three brothers that showed up to help

my sister and her family move into their new house.  I rode

with him 45 minutes to the new house, and he was trying to

teach me about a new country singer that sang, quote/unquote,

real country music and not the new hip-hop country.  We stopped

at McDonald's to get food for ten people.  We laughed ourself

1  trying to carry it all to the car.  He has the most innocent

2  heart.

3          My sister.  Preston and I would go to lunch some

4  weekends when I would come to Athens.  We would catch up on

5  each other and laugh.  Whenever I saw Preston, he would give me

6  the best hugs.  He always smiled and put his arm around me.  It

7  breaks my heart that I don't know when I will see that smile or

8  have one of his loving hugs again.

9          It was on one of those lunches that he told me about

10 this girl that he was dating.  He was so happy.  He met her at

11 Dunkin' Donuts.  He showed me a picture of her that she sent

12 him via text.  I wasn't impressed as it was a young girl trying

13 to pose flirty, but I never said anything bad because it would

14 have hurt him.  When I heard that they broke up, I was

15 relieved.

16         He was so optimistic about life.  He had a great job

17 that was going to pay for college.  He planned on taking his

18 core classes at Athens Tech and then transfer to University of

19 Georgia.  Preston had just bought his dream car and even helped

20 his own mom get a job at the University of Georgia.  I never

21 would have thought that he would do anything to jeopardize his

22 future or threaten anyone.

23         I do not believe that Preston intended to harm anyone

24 or cause any worry or trouble for anyone.  Preston has never

25 been in trouble with the law, has never hurt anyone, doesn't

1  have any weapons to my knowledge.  If he made these threats, I

2  believe he had no intention of carrying them out nor realized

3  the repercussions of his actions.  You see, Preston and my

4  brother Michael had a different upbringing than most children,

5  I believe, and this can explain why I think he didn't

6  understand the magnitude of his actions.

7         Michael got Preston a job at Dunkin' Donuts.  Michael

8  was a manager and living out on his own, as living with Toni

9  again was not a good idea.

10         Preston loved his first job.  Not really the job

11  itself, but having something that made him feel worthwhile and

12  like he was accomplishing something.  He even got a second job

13  at Zaxbys.  He moved out and lived with some friends.  He also

14  began socializing and learning how to be independent.

15         Please keep in mind that by this time most people his

16  age have lived on their own and are beginning in corporate

17  America after college.  To say that Preston was behind the

18  curve socially and in reality is an understatement.

19         While at Dunkin' Donuts he met this girl.  They

20  started dating.  Preston didn't really have girlfriends.

21  Michael and Jaime were the two that girls took to.  According

22  to Preston and Michael, the girl -- this girl had some issues

23  with her family.

24         One night she called Preston upset and asked him to

25  come to her parents' house and that they wouldn't let her

1   leave.  He goes to the house and the parents wouldn't let

2   Preston see her.  The caring and loving person that Preston is,

3   he told them that he wouldn't leave until he saw her and knew

4   she was okay.

5           The police were called and a restraining order was

6   taken out on Preston.  If Preston didn't care about people, he

7   would have left.

8           He and Michael pass back and forth between living with

9   friends, living with Toni, and living with Mike.  There was

10  never a stable upbringing.

11          I'm apologize, Your Honor.  I lost my place.

12          There wasn't child or a team development taught by his

13  parents or how to handle relationships, the consequences,

14  actions, or how to handle breakups.  Despite the emotional

15  abuse and abandonment over the years, Preston would never talk

16  badly about either.  He loved them both very much.  As a matter

17  of fact, he was the only one that cared about whether Mike was

18  doing well or not.

19          I haven't spoken to our biological father in many

20  years.  My sister and I were raised by our mom and stepfather

21  who we consider to be our dad.  My sister and I had a very

22  different upbringing than Michael and Preston.  We had two

23  parents that loved us and gave us structure, taught us that

24  there are consequences and rewards for our actions and

25  encouraged them.  Michael and Preston were shuffled between two

1    unhealthy homes and living with friends.

2           Your Honor, I know in my heart of hearts that Preston

3    had no intention of carrying out the threats that were made.  I

4    truly believe that if Preston did this, it was with the mind of

5    a jealous teenager and not that of a 27-year-old man.  I think

6    that his lack of stable home and parenting didn't prepare him

7    on how to handle being used and brokenhearted.

8           Please know that I'm not making excuses for Preston.

9    He can makes his own decisions.  I am in disbelief that this

10   happened at the hands of my brother but could understand how it

11   could have happened due to the way he was brought up.

12          I ask you to please see the other side of the person

13   being accused of these actions.  That he is a bright, sweet,

14   and caring person with no intentions of ever hurting anyone.

15   He made a serious mistake that carries grave consequences.

16          I would like to thank you for allowing me to share my

17   thoughts and experiences of Preston.  I appreciate your

18   consideration and I am grateful to be given a platform to speak

19   on his behalf.  I hope that given insight to Preston's

20   personality and intentions while also giving insight to his

21   background for some understanding of his actions.

22          I love my brother with all my heart and would not

23   defend him if I thought that he had ill intention or would hurt

24   anyone.  I am so sorry to all the parents, children, people,

25   and law enforcement that were affected by his actions.  I can't

1    imagine what they went through.  The fear, the not knowing if

2    their child was okay if they came home that night.  To them

3    please know that this letter is not to diminish what they went

4    through.  To my brother, I love you so much and I always will.

5            And, Your Honor, Ms. Fellabaum, who is also present in

6    court, also wrote a letter.  And Ms. Fellabaum has -- she and

7    Preston's father divorced when Preston was around four or five

8    years of age.  And it was in some aspects an unstable home.

9    Ms. Fellabaum had a lot to contend with with a husband who was

10   an alcoholic, an abusive alcoholic.  This is a family that had

11   problems.  But in spite of that, Ms. Fellabaum did her best to

12   provide treatment and diagnosis for Mr. McWaters as has been

13   documented through the medicals that have been provided and

14   through the testimony of Dr. Brannon.

15           I want to lastly make a comment with respect to what

16   Mr. Fels had related to the Court in terms of what he perceives

17   to be Mr. McWaters' attempts at faking his handwriting.

18           Mr. Fels, Mr. Preston, Mr. Sloan with the FBI, myself

19   were at the Joseph Conte Facility for eight or nine hours.

20   Mr. McWaters was -- and this is not the first time that I have

21   sat through writing exemplars.  It is a grueling experience.

22   He had to -- and as Mr. Fels said, I didn't count the number of

23   exemplars, but they were between 70 and 80.  He had to write

24   consistently.  We had one bathroom break.  He had to write 15

25   different samples of envelopes, Post-It notes, letters.

1          And at some point, Your Honor, the government was

2    instructing Mr. McWaters to write a certain way.  Mr. Fels

3    knows this.  I said to Mr. Fels, I don't think it's appropriate

4    for you to tell him to write in cursive or not cursive.  Based

5    on the advice of counsel, I told Mr. McWaters not to do -- not

6    to write -- to write as he normally writes.  Mr. Fels and I

7    agreed to disagree.  And I told Mr. Fels if he had any issue

8    with the way the handwriting exemplars were taking place, we

9    could bring it up with the Court.

10          And when we were discussing resolution of this matter

11   in terms of the applicable guidelines range and they said we

12   will forego our right to seek obstruction, I said to him in my

13   opinion you have no obstruction.  That is -- he did what he did

14   on advice of counsel.

15          And the only reason why I'm saying is, to respond to

16   what Mr. Fels has said.  Mr. Fels has given certain conclusions

17   as to what a handwriting exemplar would or would not --

18   handwriting examiner, his insights as to whether or not

19   Mr. McWaters was trying to fake his handwriting or not.  I

20   don't think it's appropriate for Mr. Fels to offer as evidence

21   a statement by someone who is not present in Court to testify,

22   especially in the context of an expert witness.

23          THE COURT:  Let me ask you this question.  What

24   weight, if any, do you feel that the Court should give to

25   Mr. McWaters' statement here in court this morning?  And if you

1  feel that you can't answer it, just tell me.  I know it puts

2  you in an awkward position.

3          MS. JHONES:  Well, it does and let me tell you why,

4  Your Honor.  I had no idea he was going to make that statement.

5          THE COURT:  I figured you did not.

6          MS. JHONES:  And I said -- I told Ms. Gilbert this

7  morning, because we ran into each other before coming here and

8  after I had left Mr. McWaters, and honestly -- and I haven't

9  completely digested it.  But based on the time that I have

10  spent with this young man, based on my conversations with

11  Dr. Brannon, I think it's consistent with this young man's

12  problems.

13          I think he truly is remorseful.  I think he is

14  remorseful.  However, he has said -- one of the things that he

15  said in this letter, and I think that he really meant it, he

16  said -- and I think I -- that he was wasn't trying to get off

17  scot free or easily.

18          I truly believe, Your Honor, whether the Court imposes

19  46 months or a 37-month sentence, that Mr. McWaters is going to

20  do his time and Mr. McWaters is -- Mr. McWaters did not want me

21  to raise the issue of his mental illness.  He did not want me

22  to do it.  And I said to him that I felt bound and determined

23  that I had to do it.  He did not want to make an issue of this.

24  He said he'll do whatever time he needs to do.

25          And I think, Your Honor, that that is typical of

1    defendants that actually have issues that -- by way of

2    mitigation, this is not an excuse.  He has to take

3    responsibility for what he's done.  He knew right from wrong.

4    This is not an insanity plea or anything.  He knew what he was

5    doing.

6         THE COURT:  Yes, but the statement, the statement that

7    Mr. McWaters gave here in court this morning belies acceptance

8    of responsibility.

9         Now, granted, we're not talking about acceptance in

10   terms of a three-level reduction, which he's already forfeited,

11   but his statement in court today belies acceptance.

12        MS. JHONES:  Your Honor, I am not exactly sure that he

13   really doesn't believe that, that he doesn't truly believe that

14   there's something behind his -- that he in response -- that he

15   may have done this.  He may have felt that this gentleman

16   Mr. Meade may have actually tried to do harm to his family.

17   Maybe in his mind he really believed that.  I don't know.

18   That's beyond my pay grade.  I don't know.  I tell you, this is

19   the first I hear of it, Your Honor.

20        THE COURT:  I understand.

21        MS. JHONES:  And again, the question becomes, Your

22   Honor, given the documented history and given the fact that he

23   has already -- he's already being punished an additional ten

24   months, the government had already previously agreed to low

25   end, how is nine additional months going to help?

```
 1              I mean, of course if the government -- if the Court
 2     believes that Mr. McWaters is a devious person, as the
 3     government has portrayed him, I suppose that nine additional
 4     months is what a devious person needs to get, the ultimate
 5     punishment.  But I think that there's a serious question here
 6     given his lack of criminal history, given he has been
 7     law-abiding, tax paying, self-sufficient.  He bought himself a
 8     brand-new -- he financed a brand-new Camaro, the car of his
 9     dreams, which he has lost as a result of his actions here.
10              And again, I think that the facts of this case warrant
11     for -- this is a substantial sentence.  There's no evidence
12     that this man could have carried out any of these threats,
13     zero, that he had the ability.  And there's even a question if
14     he really meant it even if he had the ability.
15              And for all of those reasons, Your Honor, I think --
16     the Court also has the power to impose either one year or three
17     years' supervision.  Unfortunately, we know that if
18     Mr. McWaters is as devious as the government says that he is,
19     Mr. McWaters is going to be back before this Court.  Give him
20     the maximum supervised release with the treatment necessary,
21     and let's give this gentleman the benefit of the doubt.
22              THE COURT:  All right.  The Court has considered the
23     statements of all parties, the presentence report which
24     contains the advisory guidelines as well as each of the
25     statutory factors set forth in 18 United States Code § 3553(a).
```

1          The Court finds that Mr. McWaters is financially

2   unable to pay a fine.

3          The Court having analyzed the 3553(a) factors finds

4   that there is a mental health component which contributed to

5   Mr. McWaters' actions.  However, this component does not rise

6   to the level of excusal from criminal responsibility.

7          The parties have agreed to a guideline sentence,

8   albeit the Court is not bound by that agreement.

9          The guidelines in this case offer a nine-month window

10  between 37 months and 46 months.  The Court is charged by

11  statute with imposing a sentence which is sufficient but not

12  greater than necessary to comply with the sentencing goals in

13  Paragraph 2 of Section 3553.

14          In determining a sentence within that nine-month

15  window, on the one hand, I'm impressed by the fact that

16  Mr. McWaters came in and pled guilty.  But, on the other hand,

17  I'm troubled, I'm troubled by Mr. McWaters' post-arrest conduct

18  in committing the same crime once again, and I'm troubled by

19  Mr. McWaters' statement here in court wherein he essentially

20  blames others.

21          Look, there is no magic formula for determining where

22  within that nine-month window the Court should impose a

23  sentence.  There is no bright line.  And, quite honestly, on

24  the one hand wanting to give Mr. McWaters credit for coming in

25  and pleading guilty and on the other hand recognizing the

1    post-arrest conduct and the statement here in court, I feel

2    that an appropriate sentence would be in the middle of the

3    advisory guidelines.

4           Accordingly, it is the judgment of this Court that the

5    defendant, Preston Alexander McWaters, is hereby committed to

6    the custody of the Bureau of Prisons to be imprisoned for 42

7    months.  This term consists of 42 months as to each of Counts

8    5, 7, 8, 9, 13, and 15.  All such terms to be run concurrently.

9           Pursuant to 18 United States Code § 3664(d)(5), if the

10   victim's losses are not ascertained ten days prior to the

11   sentencing hearing, the US Attorney or the Probation Officer

12   shall so inform the Court and the Court shall set a date for

13   final determination of the victim's losses not to exceed 90

14   days from the date of sentencing.

15          So Ms. Thompkins, would you please give us a date

16   within the next 90 days?

17          THE COURTROOM DEPUTY:  Yes, Your Honor.

18          THE COURT:  Or wait.  I see some activity at the

19   government's counsel table.

20          MS. GILBERT:  Yes, Your Honor.  We already inquired of

21   all of the victims.  We're not seeking restitution.

22          THE COURT:  Okay.  So that matter is moot.  There will

23   be no restitution ordered.

24          Upon release from imprisonment the defendant shall be

25   placed on supervised release for a term of three years.  This

 1   term consists of three years as to each of Counts 5, 7, 8, 9,

 2   13, and 15.  All such terms to be run concurrently.

 3          Within 72 hours of release the defendant shall report

 4   in person to the probation office in the district where

 5   released.

 6          While on supervised release the defendant shall not

 7   commit any crimes, shall be prohibited from possessing a

 8   firearm or other dangerous devices, shall not possess a

 9   controlled substance, shall cooperate in the collection of DNA,

10   and shall comply with the standard conditions of supervised

11   release, including the following special conditions:

12          Data encryption restriction, permissible computer

13   examination, anger control/domestic violence treatment, and

14   permissible search, all as noted in Part G of the presentence

15   report.

16          In addition, as a special condition the Court will

17   order alcohol abuse treatment and mental health treatment.

18          It is further ordered that the defendant shall pay

19   immediately to the United States a special assessment of $100

20   as to each of Counts 5, 7, 8, 9, 13, and 15, for a total of

21   $600.

22          The total sentence is 42 months' imprisonment, three

23   years' supervised release, and a $600 special assessment.

24          Now that sentence has been imposed, does the defendant

25   or his counsel object to the Court's finding of fact or to the

```
 1   manner in which sentence was pronounced?

 2            MS. JHONES:  No, Your Honor.

 3            THE COURT:  Let me advise you, Mr. McWaters, that you

 4   do have the right to appeal the sentence imposed.  Any notice

 5   of appeal must be filed within 14 days after entry of judgment.

 6   If you're unable to pay for the cost of an appeal, you may

 7   apply for leave to appeal in forma pauperis.

 8            Any motions by the government?

 9            MR. FELS:  Your Honor, at this point we would dismiss

10   the remaining counts in the indictment, Your Honor.

11            THE COURT:  That motion is hereby granted.

12            MS. JHONES:  May I --

13            THE COURT:  Any recommendations?

14            MS. JHONES:  I do, Your Honor.  If I may just have a

15   moment?

16            THE COURT:  Sure.

17            MS. JHONES:  Thank you.

18       (Defendant and counsel conferring sotto voce.)

19            MS. JHONES:  Your Honor, Mr. McWaters is hopeful that

20   the Court would recommend he be allowed to remain at FDC Miami,

21   South Florida.

22            THE COURT:  Is there any family here in South Florida?

23            MS. JHONES:  I'm sorry?

24            THE COURT:  Is there any family here in South Florida?

25            MS. JHONES:  No, Your Honor.
```

1    THE COURT:  He does not want to be near his family?

2    MS. JHONES:  That's the recommendation.  That's what

3    he has asked me to ask the Court, Your Honor.

4    (Defendant and counsel conferring sotto voce.)

5    MS. JHONES:  Your Honor, I misspoke.  There is -- he

6    has -- his grandmother is in Florida, although she's in Palm

7    Harbor.  But his maternal grandmother is in Florida.

8    THE COURT:  Look, I'll recommend a facility within the

9    Southern District of Florida, but I suspect that the Bureau of

10   Prisons is going to evaluate Mr. McWaters and, depending on the

11   severity of any mental health issues, they may assign him to a

12   federal medical center.

13   MS. JHONES:  I understand.

14   THE COURT:  But that's within their bailiwick.  All

15   right.

16   MS. JHONES:  Thank you, Your Honor.

17   THE COURT:  Thank you all.

18   I thought you did a very good job, Ms. Jhones.

19   MS. JHONES:  I apologize for the timing, Your Honor.

20   THE COURT:  Not necessary.  I thought the government

21   was equally very well prepared.

22   MR. FELS:  Thank you, Your Honor.

23   THE COURT:  Okay.  We will stand in recess.

24   (Proceedings concluded at 11:22 a.m.)

25

1                      C E R T I F I C A T E

2          I, Karl Shires, Registered Merit Reporter and Federal

3     Certified Realtime Reporter, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6          Dated this 6th day of May, 2019.

7

8     _____
      Karl Shires, RMR FCRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MS. GILBERT: [1]
25/18
BY MS. JHONES: [4]
8/12 9/22 24/1 36/21
MR. FELS: [21] 3/22
4/16 5/7 5/25 6/3 6/21
6/23 7/9 39/14 39/19
43/24 44/13 44/18
46/18 46/23 47/23
48/6 50/4 50/6 75/8
76/21
MS. GILBERT: [5]
9/10 25/16 36/14
36/16 73/19
MS. JHONES: [40]
3/24 4/4 4/18 5/12
7/22 8/1 9/14 9/20
23/23 25/13 36/18
38/1 38/24 39/5 39/8
41/24 44/7 51/6
52/17 60/2 60/4 60/11
61/16 61/21 69/2 69/5
70/11 70/20 75/1
75/11 75/13 75/16
75/18 75/22 75/24
76/1 76/4 76/12 76/15
76/18
THE COURT
REPORTER: [1] 61/14
THE COURT: [70] 3/1
3/23 3/25 4/3 4/13
4/17 5/6 5/9 5/14 6/2
6/19 6/22 7/7 7/10
7/14 7/18 7/25 8/4 8/6
8/10 9/16 23/25 25/15
36/15 36/17 36/19
38/2 38/5 38/14 38/23
38/25 39/3 39/7 39/9
39/18 41/22 41/25
43/22 44/12 46/15
46/21 47/19 48/2 50/2
50/5 51/4 52/12 59/25
60/3 60/7 61/17 68/22
69/4 70/5 70/19 71/21
73/17 73/21 75/2
75/10 75/12 75/15
75/21 75/23 75/25
76/7 76/13 76/16
76/19 76/22
THE COURTROOM
DEPUTY: [1] 73/16
THE DEFENDANT:
[2] 4/2 42/1
THE PROBATION
OFFICER: [2] 7/12
7/16
THE WITNESS: [5]
8/9 38/4 38/6 38/17
39/1

**$**
**$10,000 [1]** 5/20
**$100 [2]** 5/22 74/19
**$100,000 [1]** 5/20
**$15,000 [1]** 7/17

**$150,000 [1]** 7/18
**$600 [3]** 5/22 74/21
74/23

**'**
**'94 [1]** 9/9
**'95 [1]** 16/15
**'96 [1]** 16/15

**-**
**-v [1]** 1/6

**1**
**10 [1]** 4/21
**1038 [1]** 3/15
**10:51 [1]** 60/6
**11 [1]** 30/14
**11:22 [1]** 76/24
**12 [2]** 56/11 58/14
**13 [6]** 3/9 3/10 3/17
73/8 74/2 74/20
**13th [1]** 3/8
**14 [1]** 75/5
**15 [10]** 3/9 3/10 3/17
33/23 52/2 55/13
67/24 73/8 74/2 74/20
**15 percent [1]** 27/14
**15,000 [2]** 7/19 22/12
**15-count [1]** 3/9
**150,000 [1]** 7/19
**16-80043-CR [1]** 3/4
**16-80043-CR-COHN
[1]** 1/2
**16th [1]** 30/15
**17th [1]** 30/16
**18 [6]** 3/12 3/14 5/17
6/21 71/25 73/9
**18th [1]** 11/11
**1990 [1]** 8/18
**1994 [2]** 8/25 9/8
**1996 [4]** 10/25 11/1
13/16 52/9
**1998 [1]** 11/2
**1999 [1]** 9/3

**2**
**20 [2]** 45/2 62/8
**2005 [1]** 52/1
**2008 [1]** 58/20
**2014 [2]** 54/17 54/22
**2015 [4]** 42/18 54/22
54/23 62/19
**2016 [3]** 1/8 11/11
11/11
**2019 [1]** 77/6
**203G [1]** 1/24
**21 [1]** 6/21
**220 [1]** 51/17
**23 [1]** 4/21
**250 [1]** 51/17
**26 [2]** 14/16 50/4
**27 [4]** 5/18 53/11
53/15 61/2
**27-year-old [1]** 66/5
**29 [1]** 1/8
**299 [1]** 1/24
**2nd [1]** 11/23 12/1

**3**
**30 percent [1]** 24/22
**33 [2]** 5/18 53/11
**33132 [1]** 1/19
**33156 [1]** 1/22
**33301 [1]** 1/25
**3553 [6]** 44/21 46/17
47/22 71/25 72/3
72/13
**36-month [1]** 44/17
**3664 [1]** 73/9
**37 [3]** 7/9 44/18 72/10
**37-month [2]** 44/19
69/19
**3rd [1]** 11/10

**4**
**42 [3]** 73/6 73/7 74/22
**45 [1]** 62/22
**46 [3]** 7/9 69/19 72/10
**46-month [1]** 44/20
**4th [2]** 1/19 11/24

**5**
**5496 [1]** 1/24
**561 [1]** 32/15
**567-item [1]** 21/21
**5th [1]** 15/10

**6**
**60 [2]** 33/25 49/15
**6th [1]** 77/6

**7**
**70 [1]** 67/23
**72 [1]** 74/3
**76 [1]** 49/14
**769-5496 [1]** 1/24

**8**
**80 [1]** 67/23
**875 [1]** 3/13

**9**
**90 [3]** 44/1 73/13
73/16
**9100 [1]** 1/21
**954 [1]** 1/24
**99 [1]** 1/19
**9:30 [1]** 1/9

**A**
**a.m [3]** 1/9 60/6 76/24
**abandonment [1]**
65/15
**abiding [2]** 55/5 71/7
**ability [4]** 31/15 33/12
71/13 71/14
**able [14]** 10/5 14/21
14/22 15/25 19/8
19/10 23/7 23/19 26/5
26/10 37/11 37/13
38/13 54/7
**above-entitled [1]**
77/5
**absolutely [4]** 30/3

**5**
**4/7 44/8 56/14**
36/8 37/6

**abundant [1]** 62/2
**abuse [4]** 11/23 17/14
65/15 74/17
**abusive [1]** 67/10
**accept [2]** 38/14 43/15
**acceptance [8]** 3/16
6/5 6/17 7/5 53/18
70/7 70/9 70/11
**accepted [1]** 20/15
**accessing [1]** 32/2
**accomplish [1]** 51/2
**accomplishing [1]**
64/12
**account [4]** 30/11
30/20 30/21 43/10
**accounts [1]** 55/2
**accurate [2]** 5/6 42/14
**accused [2]** 20/15
66/13
**achieve [1]** 48/24
**acronyms [1]** 12/13
**act [2]** 53/8 55/22
**acted [2]** 43/11 55/4
**acting [1]** 21/13
**action [1]** 43/12
**actions [23]** 16/6
20/10 20/21 22/13
23/1 24/5 42/14 43/19
55/7 55/25 57/10
57/13 57/13 57/20
64/3 64/6 65/14 65/24
66/13 66/21 66/25
71/9 72/5
**activity [3]** 28/3 50/10
73/18
**acts [4]** 42/21 47/7
48/9 57/21
**Adam [1]** 3/7
**ADAMS [1]** 1/17
**add [1]** 14/4
**added [1]** 17/6
**Adderall [1]** 19/7
**addition [2]** 14/4
74/16
**additional [7]** 16/9
48/9 53/14 53/21
70/23 70/25 71/3
**address [8]** 31/24
32/5 40/2 41/5 41/20
45/11 45/18 49/5
**addressed [4]** 40/3
41/8 52/19 57/1
**ADHD [24]** 14/10
15/20 16/4 16/10 17/3
19/4 19/21 19/23
20/11 21/1 21/5 24/12
24/13 25/7 27/10
27/12 27/15 28/22
29/16 31/6 31/17
31/20 37/6 47/6
**adjudged [1]** 3/17
**administration [1]**
46/23
**adult [11]** 14/16 15/11
15/18 16/4 19/4 19/12

**23/10 24/17 27/12**
36/8 37/6
**adult's [1]** 15/15
**adulthood [2]** 15/14
15/15
**adults [1]** 14/15
**advice [2]** 68/5 68/14
**advise [1]** 75/3
**advisory [4]** 5/15 5/18
71/24 73/3
**affect [1]** 33/12
**affixed [2]** 39/25 41/4
**age [12]** 13/20 13/21
14/16 24/20 24/23
26/15 51/21 52/10
55/12 55/13 64/16
67/8
**agent [2]** 44/10 45/1
**agent's [2]** 40/15 45/2
**aggression [1]** 47/7
**aggressive [3]** 38/20
66/5
**ago [4]** 28/4 32/19
44/2 58/1
**agree [7]** 5/10 6/17
16/11 27/16 28/18
29/24 32/17
**agreed [7]** 6/24 43/4
44/16 53/17 68/7
70/24 72/7
**agreement [6]** 6/2
6/15 6/20 53/16 53/17
72/8
**ahead [1]** 61/21
**Airport [1]** 30/24
**albeit [1]** 72/8
**alcohol [14]** 14/4 17/7
17/14 17/14 17/15
23/14 23/20 26/21
27/3 27/6 27/8 35/18
47/3 74/17
**alcohol-induced [1]**
27/8
**alcoholic [4]** 52/6
54/12 67/10 67/10
**alcoholics [1]** 52/7
**alcoholism [1]** 17/20
**ALEXANDER [5]** 1/7
3/3 42/11 57/3 73/5
**allow [1]** 20/2
**allowed [2]** 46/13
75/20
**allowing [1]** 66/16
**alluded [1]** 40/8
**Amanda [3]** 56/6
59/25 60/13
**AMERICA [3]** 1/4 3/3
64/17
**amount [7]** 5/4 50/25
**Amy [1]** 59/25
**ANA [1]** 1/21 3/5
**analysis [1]** 41/16
**analyst [1]** 40/6
**analyzed [1]** 72/3
**anger [3]** 38/4 47/8
74/13
**angry [3]** 20/11 25/1

**A**

angry... [1] 25/5
anonymizer [4] 31/21 32/8 32/12 46/2
answer [3] 12/24 25/10 69/1
anticipate [2] 16/1 21/1
anticipating [2] 16/3 24/19
anticipation [3] 20/3 46/7 46/8
antipsychotic [1] 51/24
antisocial [1] 21/9
anxiety [3] 11/24 18/20 21/23
anybody [1] 12/22
apartment [1] 62/14
apologize [5] 7/24 43/18 57/2 65/11 76/19
apology [1] 42/15
app [1] 32/11
appeal [4] 75/4 75/5 75/6 75/7
appear [6] 15/14 15/14 15/17 15/18 15/23 22/19
Appearances [1] 1/16
appeared [2] 40/13 41/3
appears [7] 17/12 17/13 18/18 37/1 37/24 37/25 49/16
applicable [1] 68/11
application [2] 32/11 35/4
apply [1] 75/7
applying [1] 25/3
appointed [2] 10/11 10/6
appreciate [2] 58/8 66/17
approach [1] 58/7
appropriate [8] 5/11 10/6 11/17 11/21 16/14 68/3 68/20 73/2
approximate [1] 22/7
aptly [1] 14/13
area [10] 8/24 9/6 9/9 9/22 10/2 19/12 23/10 32/15 34/5 45/22
areas [3] 9/24 13/1 13/2
argue [1] 42/5
argues [1] 31/5
arguing [2] 53/23 53/24
argument [5] 39/6 39/18 40/21 41/22 41/24
arguments [1] 61/8
arm [1] 63/6
arrest [2] 72/17 73/1
arrested [4] 29/8 45/13 50/4 52/17

arrive [1] 13/11
art [2] 35/5 35/13
ascertain [1] 12/3
ascertained [1] 73/10
aside [2] 35/10 38/8
asked [8] 32/19 38/16 40/17 42/6 49/10 62/3 64/24 76/3
asks [1] 32/14
aspect [1] 55/4
aspects [1] 67/8
assess [1] 11/18 12/15
assessed [1] 7/2
assessment [8] 5/21 11/25 38/19 38/19 38/23 55/24 74/19 74/23
assessments [1] 10/5
assign [1] 76/11
assigned [1] 25/22
assist [3] 12/3 17/2 23/7
assistance [1] 58/23
Assistant [3] 1/18 3/6 57/4
Athens [8] 11/4 32/14 52/4 56/4 58/12 58/13 63/4 63/18
Atlanta [1] 62/16
attempt [1] 44/11
attempted [1] 54/13
attempting [2] 6/10 12/18
attempts [2] 31/5 67/17
attending [1] 23/13
attention [16] 13/25 14/7 14/19 14/22 14/24 15/1 15/11 18/12 18/25 19/12 20/1 22/3 23/6 23/10 59/20 59/22
attention-deficient [1] 23/10
attention-deficit [6] 14/19 15/1 18/12 18/25 19/12 23/6
attention-deficit/hype ractivity [3] 13/25 14/7 15/11
attentive [1] 52/5
attentiveness [1] 23/8
Attorney [2] 57/4 73/11
attorneys [3] 1/18 3/7 50/2
attributable [1] 21/11
audio [1] 61/20
authorities [1] 42/23
authority [1] 21/10
avail [1] 19/8
available [3] 19/1 50/22 50/23
average [6] 37/1 37/2 37/5 37/8 37/8 52/20

avoid [2] 44/11 46/9
avoided [1] 7/7
avoiding [1] 22/20
awaiting [1] 5/1
aware [4] 30/22 33/16 33/18 38/20
awkward [1] 69/2

**B**

B-R-A-N-N-O-N [1] 8/10
back [6] 13/16 16/14 38/15 58/20 65/8 71/19
background [2] 26/1 66/21
bad [4] 16/7 22/19 61/10 63/13
badly [1] 65/16
bailiwick [1] 76/14
Baker [1] 11/1
ball [3] 43/25 51/11 53/2
bank [1] 30/4
Bannon [1] 46/20
Barkley [1] 24/21
basal [1] 26/6
based [8] 6/6 13/10 13/10 44/21 48/1 68/4 69/9 69/10
basically [6] 24/13 26/7 32/1 33/19 45/17 53/24
basis [1] 11/5
bathroom [1] 67/24
Beach [7] 30/24 30/25 32/15 40/2 41/8 41/14 49/7
bearing [1] 5/11
Beck [2] 11/24 11/25
began [1] 64/14
beginning [1] 64/16
behalf [2] 10/8 66/19
behavior [21] 14/20 17/18 17/18 19/10 20/25 21/2 21/7 21/12 23/18 26/19 27/1 27/5 27/6 27/24 28/1 29/14 29/19 29/21 33/5 34/8 38/14
Behavioral [2] 8/23 11/3
behaviors [8] 19/24 20/1 20/2 20/13 31/4 31/4 35/22 38/20
belief [1] 56/14
belies [2] 70/7 70/11
believe [19] 14/18 42/3 44/20 47/16 48/14 49/8 49/13 54/22 57/16 59/18 60/23 60/25 63/23 64/2 64/5 66/4 69/18 70/13 70/13
believed [3] 40/11 56/13 70/17

believes [1] 7/2
beneficial [2] 23/15
benefit [4] 21/4 22/24 37/11 71/21
best [8] 19/5 33/2 43/12 56/8 56/10 59/4 63/6 67/11
better [8] 12/8 19/10 19/13 23/11 23/22 24/9 35/23 51/10
beyond [2] 9/13 70/18
biological [2] 60/14 65/19
bipolar [3] 14/2 18/10 18/11
bit [3] 24/8 39/18 43/25
blames [1] 72/20
blindsided [1] 57/10
blinking [1] 26/11
block [1] 40/18
bothers [1] 57/15
bought [4] 45/22 53/21 63/19 71/7
Boulevard [1] 1/21 1/24
bound [4] 53/9 55/22 69/22 72/8
boy [1] 62/8
boyfriend [1] 59/14
brain [4] 15/1 15/2 15/13 26/7
brakes [8] 16/7 16/7 19/15 24/4 24/4 25/3 28/5 53/9
brand [2] 71/8 71/8
brand-new [2] 71/8 71/8
Brandon [1] 22/7
Brannon [27] 4/15 7/21 8/4 8/6 8/10 8/14 8/20 9/5 9/18 9/24 12/2 17/20 22/23 24/3 36/23 42/3 46/20 47/1 50/22 51/23 52/8 52/18 53/2 53/9 55/11 67/14 69/11
Brannon's [2] 40/22 46/5
break [3] 14/6 60/2 67/24
breaking [1] 21/9
breaks [1] 63/7
breakups [1] 65/14
Brenna [1] 58/11
brief [1] 11/14
briefly [2] 8/20 14/18
bright [2] 66/13 72/23
bring [2] 20/1 68/9
broke [1] 63/14
brokenhearted [1] 66/7
brother [17] 17/24 54/10 56/13 57/4 57/20 57/25 58/14 59/8 60/15 60/24 61/1

61/14 61/23 64/4 66/10 66/22 67/4
brothers [3] 61/6 61/8 62/20
brought [3] 17/1 59/15 66/11
Broward [1] 1/24
Bureau [2] 73/6 76/9
Burke [1] 8/23
Burke-Carter [1] 8/23
businesses [1] 43/2
buy [4] 30/11 46/1 46/12 47/13
buys [2] 30/15 32/14

**C**

Call [2] 3/1 60/7
called [8] 10/17 12/6 12/14 15/22 22/21 53/16 64/24 65/5
calling [1] 14/23
Camaro [1] 71/8
capable [1] 57/16
capacity [1] 57/6
car [5] 16/7 16/8 63/1 63/19 71/8
card [3] 45/18 45/25 46/3
cards [1] 45/25
care [4] 12/9 56/5 58/11 65/6
cared [2] 59/10 65/17
careful [1] 37/24
caring [2] 65/2 66/14
Carolina [1] 8/19
carried [1] 71/12
carries [1] 66/15
carry [3] 56/15 62/7 63/1
carrying [4] 42/21 59/17 64/2 66/3
Carter [1] 8/23
case [29] 1/2 3/4 4/23 10/18 12/17 17/11 19/18 23/4 25/22 28/12 30/1 37/14 38/19 39/21 41/12 43/8 44/3 44/21 45/1 46/6 46/18 48/10 50/18 51/14 52/11 52/15 54/19 71/10 72/9
cases [2] 22/8 32/20
cash [2] 30/4 45/21
cast [1] 38/8
catch [1] 63/4
category [3] 5/17 37/19 37/19
caught [5] 29/14 30/18 32/17 46/10 57/11
cause [8] 14/24 19/23 19/24 26/14 26/16 28/1 28/2 63/24
caused [1] 57/14
causing [1] 59/20

**C**

center [2] 49/7 76/12
certain [6] 25/2 33/12
42/21 61/1 68/2 68/16
certainly [19] 5/1 9/11
17/12 17/22 18/3 18/8
18/22 19/23 19/25
21/8 24/1 29/13 34/9
36/12 37/20 44/25
50/7 56/14 61/4
Certified [1] 77/3
certify [1] 77/3
cetera [1] 18/21
chain [1] 28/8
challenging [1] 51/14
chance [3] 11/4 39/11
41/23
chances [1] 22/25
change [1] 6/6
changed [1] 35/22
character [5] 54/3
54/4 54/5 56/12 58/6
characteristic [1]
59/16
characteristics [2]
47/22 48/1
characterization [1]
37/18
characterized [1]
55/19
characterizes [1] 4/24
charged [4] 3/10 3/13
29/7 72/10
charges [1] 59/15
charity [1] 59/9
Charter [1] 11/3
child [6] 15/19 16/22
24/15 52/1 65/12 67/2
child's [1] 15/16
childhood [5] 14/5
16/13 17/5 24/14 36/6
children [6] 14/13
14/13 14/19 56/6 64/4
66/24
Christmas [2] 62/3
62/10
chronological [1]
24/20
circumstance [1]
29/23
circumstances [2]
44/24 49/19
citizens [1] 57/14
class [1] 24/15
classes [1] 63/18
clear [3] 13/15 48/6
55/18
clearing [2] 22/2
26/10
clearly [1] 15/11
client [2] 39/8 39/12
clinical [3] 9/9 21/15
21/22
close [1] 45/7
closest [1] 58/15
clothing [1] 58/24

**C**

co-counsel [1] 44/10
coalesce [1] 13/23
coconut [1] 9/16
code [7] 3/12 3/15
32/15 41/14 45/22
71/25 73/9
codirector [1] 8/22
COHN [2] 1/2 1/13
collection [1] 74/9
Colleen [1] 10/24
college [3] 58/2 63/17
64/17
come [8] 10/17 14/24
20/14 24/10 45/7
58/16 63/4 64/25
comfortable [1] 42/1
coming [2] 69/7 72/24
comment [1] 67/15
commerce [2] 3/11
46/15
commission [1] 19/22
commit [8] 27/17 47/6
48/8 49/22 50/1 50/16
57/21 74/7
commits [1] 52/16
committed [4] 43/21
50/14 52/7 73/5
committing [4] 35/15
50/9 50/13 72/18
common [3] 27/10
27/11 35/10
commonly [2] 14/9
35/6
communication [2]
3/11 42/12
communications [1]
6/12
community [1] 58/2
company [3] 9/1 9/3
60/17
comparable [1] 16/6
comparison [2] 40/9
40/10
compassionate [1]
58/18
competency [2] 10/3
10/4
completely [4] 54/1
57/10 57/11 69/9
compliance [1] 42/21
compliant [1] 35/25
complicated [1] 53/3
comply [3] 43/4 72/12
74/10
component [4] 46/18
52/11 52/14 72/4 72/5
computer [5] 26/15
31/13 31/23 32/1
74/12
conceal [4] 31/5 34/8
40/22 45/4
conceded [1] 47/1
concern [1] 42/10
concerned [1] 50/6
Concerta [1] 19/7
concession [1] 7/6

**C**

concluded [1] 76/24
conclusion [3] 40/23
46/5 49/16
conclusions [1] 68/16
concordance [1]
18/16
concrete [3] 6/8 41/17
41/18
concurrently [1] 73/9
74/2
condense [1] 59/2
condition [9] 16/16
21/3 27/17 27/19 35/3
36/11 36/13 47/17
74/16
conditions [6] 16/21
17/2 17/4 17/10 74/10
74/11
condolences [1]
60/20
conduct [5] 6/6 19/13
46/5 72/17 73/1
conducted [3] 11/16
13/17 22/9
conducting [1] 21/15
conferring [2] 75/18
76/4
conflicted [1] 25/4
conflicts [1] 23/21
confusing [1] 46/22
connected [2] 17/18
44/7
consecutive [1] 7/7
consequence [2] 29/2
30/18
consequences [16]
16/1 16/3 20/3 20/10
21/12 28/10 28/24
29/12 40/24 44/12
46/7 46/9 47/11 65/13
65/24 66/15
consider [9] 21/2
25/10 28/10 29/7
29/22 30/17 44/22
58/6 65/21
consideration [7]
29/6 29/6 29/8 47/15
47/19 47/21 66/18
considerations [1]
44/23
considered [2] 30/1
71/22
considering [5] 20/9
21/11 28/23 38/1 48/6
considers [1] 58/15
consist [1] 10/2
consisted [1] 11/22
consistent [3] 13/19
20/25 27/1 29/15
32/16 34/7 44/4 49/15
69/11
consistently [2] 22/6
67/24
consists [2] 73/7 74/1
constellation [1]
35/22

**C**

construct [2] 42/15
45/5
contained [3] 12/12
42/19 52/8
contains [1] 71/24
Conte [1] 67/19
contemplated [1] 58/8
contend [1] 67/9
content [2] 12/10
48/21
context [2] 22/15
42/17 68/22
continuance [1] 51/13
continue [4] 30/20
49/22 50/1 60/11
continued [5] 6/6 6/9
6/9 21/25 48/19
continues [3] 29/18
30/23 30/25
continuing [1] 46/15
contrary [2] 46/5 46/8
contributed [1] 72/4
control [7] 19/9 25/3
26/5 26/9 47/7 47/8
74/13
control/domestic [1]
74/13
controlled [1] 74/9
conversations [1]
69/10
conveying [1] 3/13
convicted [1] 42/12
convince [1] 45/14
cooperate [1] 74/9
coordinator [1] 58/12
copy [1] 3/21
core [1] 63/18
corporate [1] 64/16
correct [17] 6/22 7/9
7/10 14/10 14/11
14/14 19/19 27/4
27/22 32/22 33/4 36/4
36/14 47/24 49/14
50/5 77/4
correspondence [1]
28/2
corroborated [1]
17/25
cost [1] 75/6
counsel [13] 3/20
6/13 44/10 51/9 60/10
61/15 61/19 68/5
68/14 73/19 74/25
75/18 76/4
counseling [4] 23/21
36/3 50/22 51/23
count [5] 3/9 5/22
22/12 62/17 67/22
country [3] 62/23
62/24 62/24
counts [8] 3/9 3/10
3/13 3/17 73/7 74/1
74/20 75/10
County [4] 40/2 41/8
41/14 41/15
couple [8] 4/6 9/21

**C**

25/23 36/19 59/17
40/9 56/22 59/1
course [10] 7/2 16/18
17/13 17/19 38/12
41/7 43/12 44/8 53/19
71/1
court [56] 1/1 1/24 3/1
3/2 3/16 4/8 4/9 5/16
7/24 9/17 19/21 38/23
42/14 43/16 44/21
48/6 48/21 50/4 50/15
51/13 51/13 51/16
52/4 53/23 54/7 56/9
56/10 57/1 57/2 60/7
67/6 67/16 68/9 68/21
68/24 68/25 69/18
70/7 70/11 71/1 71/16
71/19 71/22 72/1 72/3
72/8 72/10 72/19
72/22 73/1 73/4 73/12
73/12 74/16 75/20
76/3
Court's [2] 5/11 74/25
Courts [1] 10/12
cover [1] 32/13
covering [1] 29/10
CR [2] 1/2 3/4
create [1] 48/4
credit [3] 45/18 45/25
72/24
credited [1] 6/18
crime [11] 42/12
43/21 45/1 45/6 45/8
47/2 50/13 50/14
50/16 52/16 72/18
crimes [12] 27/17
35/15 42/15 43/7 43/9
43/14 47/10 49/23
50/1 50/9 51/3 74/7
criminal [17] 5/17 6/6
7/3 10/2 21/6 21/6
22/8 22/15 22/16 28/2
29/17 29/20 29/21
42/21 50/9 71/6 72/6
critical [3] 5/9 49/21
58/11
cross [4] 2/4 25/16
25/18 45/16
cross-examination [3]
2/4 25/18 45/16
crystal [1] 53/2
culpability [1] 48/16
currently [2] 9/2 42/11
curse [1] 26/9
cursive [4] 40/16
40/17 68/4 68/4
cursively [1] 33/13
curve [2] 43/25 64/18
custody [2] 50/14
73/6

**D**

dad [3] 54/14 55/15
65/21
Dade [1] 41/15
Dadeland [1] 1/21

**D**

damage [1] 15/2
danger [2] 38/17 38/19
dangerous [1] 74/8
Data [1] 74/12
date [4] 3/19 73/12 73/14 73/15
Dated [1] 77/6
dating [2] 63/10 64/20
daughter [1] 57/23
day [4] 23/21 23/21 58/23 77/6
day-to-day [1] 23/21
days [6] 30/16 30/20 73/13 73/14 73/16 75/5
deal [2] 6/7 29/4
dealt [1] 43/15
dearest [1] 58/15
dearly [1] 43/5 61/2
deceive [1] 11/19
December [2] 30/14 62/19
December 11 [1] 30/14
decent [1] 58/16
deception [1] 12/5
decision [1] 48/8
decisions [1] 66/9
decorate [1] 62/9
decrements [1] 24/22
deemed [2] 9/25 11/16
defend [1] 66/23
defendant [14] 1/8 1/20 7/6 43/24 47/23 50/3 73/5 73/24 74/3 74/6 74/18 74/24 75/18 76/4
DEFENDANT'S [1] 8/6
defendants [1] 70/1
Defender [1] 6/14
defense [6] 10/9 10/11 10/15 44/3 50/2 54/2
defensiveness [1] 21/22
deferred [1] 3/18
defiant [1] 14/3
deficient [1] 23/10
deficit [9] 13/25 14/7 14/19 15/1 15/11 18/12 18/25 19/12 23/6
definitive [1] 38/23
defusing [1] 59/11
degree [2] 52/14 58/3
deliberate [3] 46/9 47/9 47/14
deliberately [2] 34/8 49/13
delicately [1] 59/13
delivered [3] 41/5 41/20 49/4
demands [1] 15/5

denial [1] 34/23
denied [2] 18/20 21/19
denies [2] 18/21 22/22
deny [1] 22/5
denying [3] 21/23 34/25 35/6
departure [1] 47/21
depending [4] 10/13 27/13 48/3 76/10
depression [5] 12/1 18/10 18/19 18/20 21/23
depressions [1] 18/18
describe [1] 34/23
description [3] 24/12 24/13 34/22
designed [2] 12/3 12/15
despite [2] 31/17 65/14
destructive [1] 21/13
details [1] 15/25
Detection [1] 49/6
deter [1] 42/23
determination [2] 5/11 73/13
determined [4] 5/21 53/10 55/23 69/22
determining [3] 30/17 72/14 72/21
developed [1] 15/2
development [2] 16/13 65/12
device [2] 32/1 61/18
devices [2] 3/14 74/8
devious [9] 45/1 45/4 49/1 55/19 55/19 55/20 71/2 71/4 71/18
deviousness [1] 56/20
Devon [3] 4/23 54/18 54/20
devoted [1] 57/23
diagnose [1] 13/14
diagnosed [2] 15/20 27/12
diagnoses [5] 18/8 18/11 18/15 18/19 34/13
diagnosing [2] 10/5 13/16
diagnosis [17] 13/12 13/19 13/24 14/12 14/14 14/12 14/13 16/9 16/14 18/7 20/20 26/3 27/10 37/6 46/6 47/2 67/12
Diagnostic [1] 15/9
didn't [15] 28/14 34/9 35/3 36/6 47/3 47/3 54/20 58/22 62/5 62/15 64/5 64/20 65/6 66/6 67/22
different [11] 11/16 15/13 18/9 21/8 23/17

31/4 55/23 61/5 64/4 65/22 67/25
differently [3] 15/14 15/17 18/5
difficult [2] 21/20 58/9
difficulties [4] 17/25 18/6 24/18 34/24
difficulty [1] 15/25
digested [1] 69/9
diminish [1] 67/3
DIRECT [2] 2/3 8/12
direction [1] 29/11
disagree [1] 68/7
disbelief [1] 66/9
discoverable [1] 34/16
discussing [2] 58/2 68/10
discussion [1] 38/21
disingenuous [2] 24/12 57/8
dismiss [1] 75/9
disorder [26] 14/1 14/1 14/2 14/3 14/4 14/7 14/17 14/19 15/1 15/11 15/12 16/15 17/6 17/7 18/10 18/11 18/13 18/16 18/23 18/25 18/25 19/11 21/8 23/6 23/10 26/6
disorders [7] 18/9 18/9 18/17 18/17 33/11 34/6 35/19
display [1] 33/7
displays [1] 22/1
dispute [1] 39/16
disrupt [1] 14/24
disruptive [2] 21/7 24/15
distortion [1] 12/7
distress [1] 17/15
district [6] 1/1 1/1 1/14 57/4 74/4 76/9
diversions [1] 10/6
divorced [2] 16/23 67/7
DNA [1] 74/9
doctor [12] 8/5 8/8 11/6 13/10 16/9 18/7 18/24 20/14 25/20 37/13 38/2 39/1
documentation [1] 51/22
documented [5] 54/4 54/17 55/11 67/13 70/22
documents [8] 10/21 13/10 17/19 51/15 51/19 51/22 51/23 52/2
doing [13] 14/23 20/8 20/9 28/20 29/5 33/2 33/6 33/9 37/23 59/4 62/17 65/18 70/5
dollar [1] 35/14
domestic [1] 74/13

donated [1] 59/3
Donuts [8] 54/10 54/17 54/18 54/21 54/21 63/11 64/7 64/19
doubt [1] 71/21
Dr [1] 12/2
Dr. [33] 4/15 7/21 8/4 8/14 8/20 8/22 9/5 9/18 9/24 10/24 11/1 11/2 17/20 22/7 22/23 24/3 24/21 36/23 40/22 42/3 46/5 46/20 47/1 50/22 51/20 51/23 52/8 52/8 52/18 53/2 53/9 55/11 67/14 69/11
Dr. Bannon [1] 46/20
Dr. Brandon [1] 22/7
Dr. Brannon [23] 4/15 7/21 8/4 8/14 8/20 9/5 9/18 9/24 17/20 22/23 24/3 36/23 42/3 47/1 50/22 51/23 52/8 52/18 53/2 53/9 55/11 67/14 69/11
Dr. Brannon's [2] 40/22 46/5
Dr. Colleen [1] 10/24
Dr. Edward [1] 11/2
Dr. Jean [1] 11/1
Dr. McLemore [1] 51/20
Dr. Russell [1] 24/21
Dr. Sheri [1] 8/22
dream [1] 63/19
dreams [1] 71/9
drifted [1] 15/3
drinking [1] 55/15
drop [2] 30/6 62/17
dropped [1] 51/11
drunk [1] 26/24
DSM [1] 15/11
due [1] 66/11
Dunkin' [8] 54/10 54/17 54/18 54/21 55/1 63/11 64/7 64/19
duress [2] 44/3 44/3
dynamics [1] 15/8
dysfunction [1] 53/6

**E**

E.M [1] 6/10
earlier [3] 13/19 19/15 48/25
early [4] 15/20 15/21 16/13 62/16
easily [2] 34/16 69/17
East [1] 1/24
easy [2] 43/22 57/9
Edition [4] 11/23 11/24 12/1 15/10
Edward [1] 11/2
effect [4] 24/7 47/3 47/4 48/16
effort [1] 48/24
efforts [2] 45/4 45/5

eight [6] 34/14 34/4 40/8 49/12 49/15 67/19
either [7] 18/2 22/18 22/18 27/7 37/4 65/16 71/16
elaborate [6] 17/9 24/8 41/11 45/5 45/23 49/1
electronic [1] 61/18
element [1] 56/20
eliminate [1] 23/19
else's [2] 28/20 30/12
emails [1] 27/20
embarrassed [3] 13/2 21/24 33/1
embarrassing [1] 33/10
embolden [1] 29/18
emotional [2] 17/15 65/14
emotions [2] 23/12 25/13
employed [3] 8/21 9/6 54/9
employer [1] 45/10
enact [1] 19/11
encouraged [1] 65/25
encryption [1] 74/12
endeavor [1] 9/5
enforcement [4] 29/11 45/3 45/14 66/25
engage [9] 12/4 12/18 19/24 19/25 20/2 22/25 28/2 29/14 35/21
engaged [1] 48/25
enjoyed [1] 62/8
enjoys [1] 21/9
entered [2] 3/8 44/13
entire [3] 38/1 56/24 58/24
entitled [2] 47/25 77/5
entrusted [1] 56/5
entry [1] 75/5
envelope [3] 33/20 40/1 41/6
envelopes [1] 67/25
environment [3] 15/5 27/25 35/23
equally [1] 76/21
escalated [1] 59/12
especially [10] 15/20 17/18 20/6 20/10 24/25 29/3 32/25 37/20 55/6 68/22
ESQ [1] 1/21
essence [1] 52/24
essentially [4] 28/22 49/5 52/16 72/19
et [1] 18/21
evade [1] 49/17
evaluate [1] 76/10
evaluated [1] 13/20
evaluation [10] 4/9

**E**

evaluation... [9] 4/15
10/18 10/21 10/24
12/23 13/17 16/18
21/15 22/15
evaluations [9] 10/2
10/3 10/3 10/7 16/12
16/19 22/8 22/8 22/17
Eventually [1] 30/24
evidence [13] 6/8 7/1
7/1 8/3 12/19 39/6
39/11 39/13 39/18
39/20 41/21 68/20
71/11
exactly [1] 70/12
exaggerate [2] 11/20
13/5
exaggeration [1]
12/16
examination [8] 2/3
2/4 2/4 8/12 25/18
36/21 45/16 74/13
examiner [1] 68/18
examiner's [1] 49/16
example [3] 19/15
40/15 47/5
examples [5] 15/18
19/13 21/18 33/22
49/15
exceed [1] 73/13
excellent [1] 46/8
exception [2] 5/5
47/12
exchange [1] 43/3
exclusively [1] 8/24
excusal [1] 72/6
excuse [3] 9/11 43/13
70/2
excused [1] 39/3
excuses [1] 66/8
exemplar [2] 33/17
68/17
exemplars [3] 67/21
67/23 68/8
exhibited [1] 22/14
expect [2] 43/22 47/5
experience [1] 67/21
experiences [1] 66/17
expert [6] 8/4 9/12
9/18 9/25 10/8 68/22
expertise [2] 9/20
9/22
explain [6] 6/7 14/15
19/21 24/8 27/23 64/5
explained [2] 34/13
46/21
explanation [8] 5/3
26/17 31/16 34/4 41/8
42/15 48/13 48/19
explanations [1] 47/1
explosive [1] 3/14
exposing [1] 47/13
extensive [2] 13/15
16/12
extent [2] 43/15 54/2
extreme [1] 26/9

**F**

fabricate [1] 11/20
fabrication [1] 12/16
face [1] 47/13
Facebook [1] 30/21
facility [2] 67/19 76/8
fact [17] 15/9 20/15
28/14 28/19 31/17
41/4 49/3 49/6 52/15
53/3 53/5 56/1 56/2
65/17 70/22 72/15
74/25
factor [2] 47/25 48/4
factored [1] 53/18
factors [9] 44/21
46/17 47/22 49/21
50/18 50/18 50/21
51/25 72/3
facts [5] 19/17 28/11
30/17 44/4 71/10
factual [4] 4/20 11/5
19/18 49/14
fake [1] 68/19
faking [1] 67/17
fall [1] 37/18
false [2] 3/13 49/9
familiar [2] 19/17
20/18
family [23] 17/21
17/22 17/23 18/4
42/20 42/22 42/25
54/8 57/1 58/5 58/17
58/20 59/8 59/11 61/4
62/18 62/21 64/23
67/10 70/16 75/22
75/24 76/1
family's [1] 59/5
fantastical [7] 16/5
20/4 29/1 37/10 37/18
38/1 51/25
farther [1] 36/5
fascination [1] 37/22
FAST [1] 12/14
father [7] 16/25 17/24
36/6 52/6 60/15 65/19
67/7
father's [2] 16/25 52/6
favor [1] 53/24
FBI [1] 67/18
FCRR [2] 1/23 77/8
FDC [2] 39/22 75/20
fear [2] 43/4 43/11
67/1
feature [1] 15/7
features [1] 27/14
February [1] 54/23
federal [5] 6/13 10/12
42/12 43/16 49/6
76/12 77/2
feel [5] 20/11 64/11
68/24 69/1 73/1
feeling [2] 38/8 38/8
feelings [1] 42/7
feigning [1] 13/1
fell [1] 58/20
Fellabaum [7] 13/9
52/3 60/16 67/5 67/6
67/9 67/11
FELS [17] 1/17 3/7
3/22 39/13 43/23 51/5
51/9 67/16 67/18
67/22 68/2 68/3 68/6
68/7 68/16 68/16
68/20
Fels' [1] 51/12
felt [3] 43/11 69/22
70/15
field [3] 9/13 9/18 9/20
fiercely [1] 58/17
fight [1] 59/12
figure [1] 32/8
figured [1] 69/5
figures [1] 27/13
filed [2] 4/5 75/5
filing [1] 4/10
final [2] 27/9 73/13
financed [1] 71/8
financially [1] 72/1
find [5] 12/17 24/10
37/21 58/22 60/24
finding [2] 59/13
74/25
findings [1] 5/16
finds [2] 72/1 72/3
fine [5] 5/20 7/15 7/17
9/16 72/2
firearm [1] 74/8
fired [2] 54/21 54/25
first [20] 11/6 30/15
30/15 31/9 38/8 39/21
41/1 41/19 42/2 43/24
44/23 47/16 51/12
52/22 54/23 57/19
62/12 64/10 67/20
70/19
fit [7] 22/5 33/2 33/8
36/9 36/11 43/17 47/2
five [7] 13/21 13/21
51/21 52/10 55/11
55/12 67/7
five-page [1] 55/11
flirty [1] 63/13
FLORIDA [13] 1/1 1/8
1/19 1/22 1/25 8/18
45/22 75/21 75/22
75/24 76/6 76/7 76/9
focused [1] 52/23
Folks [1] 60/8
follow [1] 24/17
followed [2] 38/14
42/24
following [4] 5/16
42/13 56/25 74/11
food [2] 55/2 62/25
foot [2] 53/13 53/20
foreclosure [1] 58/21
forego [1] 68/12
foregoing [1] 77/3
feels [2] 29/3 42/7
7/25 8/24 9/8 11/25
13/4 22/8
forensic [8] 4/6 4/15
7/6
forensically [2] 11/17
11/20
forensics [1] 55/12
forfeited [1] 70/10
form [10] 8/4 17/11
18/22 19/5 20/7 26/9
42/16 48/17 48/18
49/17
forma [1] 75/7
formal [1] 38/18
former [1] 6/13
forms [1] 27/15
formula [1] 72/21
formulated [1] 52/9
forth [5] 5/3 65/8
71/25
four [2] 33/23 67/7
frame [4] 41/11 45/20
45/24 49/1
framing [2] 28/19
34/12
free [2] 62/15 69/17
frequently [1] 10/12
friend [6] 56/8 56/10
56/13 58/11 59/7
59/13
friend's [1] 58/13
friends [7] 58/15
58/17 59/11 62/18
64/13 65/9 66/1
Fs [2] 40/16 40/19
fueled [1] 53/5
full [2] 18/19 43/8
fullest [1] 43/15
fully [2] 37/11 43/14
function [1] 37/9
functioning [3] 24/23
36/24 36/25
functions [1] 37/2
furniture [1] 58/24
further [2] 36/17
74/18
future [11] 16/1 16/3
20/3 21/11 23/1 35/15
36/2 46/7 50/12 51/3
63/22

**G**

gain [2] 22/20 42/20
gained [1] 21/4
gainfully [1] 54/9
game [2] 47/9 47/9
ganglia [1] 26/7
gathered [1] 54/8
generally [1] 9/10
gentleman [3] 54/16
70/15 71/21
Georgia [8] 32/14
45/23 52/4 55/2 56/4
58/13 63/19 63/20
getting [7] 29/7 30/18
32/17 38/15 42/25
46/13 59/19
GILBERT [9] 1/18 2/4
3/7 25/16 38/16 40/7
45/16 51/9 69/6
girl [5] 63/10 63/12
64/19 64/22 64/22
girlfriend [3] 52/24
55/22 55/24
girlfriends [1] 64/20
girls [1] 64/21
give [25] 8/8 11/14
15/17 18/19 21/18
25/9 30/8 30/9 32/13
39/10 39/12 41/23
42/14 46/17 46/19
46/25 47/14 57/8
62/11 63/5 68/24
71/19 71/21 72/24
73/15
given [9] 43/1 47/18
66/18 66/19 68/16
70/22 70/22 71/6 71/6
giving [3] 13/23 19/13
66/20
go [4] 27/9 61/21 62/3
63/3
goal [2] 48/24 51/2
goals [1] 72/12
goes [6] 4/21 18/12
30/4 30/5 41/5 65/1
going [17] 4/9 13/16
42/5 44/2 44/17 56/18
56/19 56/20 58/2
58/18 59/23 63/17
69/4 69/19 70/25
71/19 76/10
good [13] 3/2 8/14
8/15 13/21 20/7 25/12
25/20 25/21 43/20
50/8 61/6 64/9 76/18
good-hearted [1] 61/6
goodness [1] 57/22
gotten [3] 29/4 61/12
61/24
government [24] 1/17
3/6 5/7 5/23 6/16 7/3
39/11 39/13 43/16
43/23 51/18 51/22
52/2 53/17 54/1 55/19
56/20 68/1 70/24 71/1
71/3 71/18 75/8 76/20
government's [1]
73/19
grade [1] 70/18
graduated [1] 58/1
grandfather [1] 52/7
grandmother [4] 62/4
62/10 76/6 76/7
grandmother's [1]
62/7
grandparents [1] 18/5
granted [3] 4/18 70/9
75/11
grateful [1] 66/18
grave [1] 66/15
great [1] 63/16

**G**

greater [1] 72/12
greatly [1] 58/8
grew [2] 14/25 15/4
grimacing [2] 26/11
33/9
group [2] 23/13 23/14
grueling [1] 67/21
Gs [2] 40/16 40/19
guarantee [2] 35/17
35/24
guard [1] 57/11
guess [1] 4/6
guidance [1] 55/6
guide [1] 19/12
guideline [2] 44/16
72/7
guidelines [6] 5/16
47/16 68/11 71/24
72/9 73/3
guilty [9] 3/9 3/17
43/9 44/13 48/10
49/25 53/11 72/16
72/25
gym [1] 59/6

**H**

Haldol [3] 51/24 51/25
52/1
HALEY [1] 1/20
hand [6] 18/12 18/12
72/15 72/16 72/24
72/25
handle [3] 65/13
65/14 66/7
hands [1] 66/10
handwriting [11]
33/17 40/6 40/7 40/14
41/16 49/16 67/17
68/8 68/17 68/18
68/19
handwritings [1]
40/13
handwritten [1] 49/4
happen [4] 21/1 24/19
25/9 29/6
happened [4] 54/22
54/24 66/10 66/11
happens [3] 20/6
28/23 37/7
happy [3] 9/14 44/9
63/10
harassed [1] 4/24
Harbor [1] 76/7
hard [4] 58/3 58/20
60/23 60/24
hard-working [1] 58/3
harm [4] 43/7 59/20
63/23 70/16
harmed [1] 57/13
hatred [1] 43/6
he'll [1] 69/24
head [3] 26/11 61/13
62/1
health [17] 4/12 11/4
18/6 34/11 34/25

46/17 47/17 47/23
52/11 52/14 53/1
54/12 54/15 55/10
72/4 74/17 76/11
hear [5] 14/9 14/12
41/24 43/23 70/19
heard [6] 5/7 39/8
41/24 57/18 61/3
63/14
hearing [1] 73/11
heart [7] 9/14 43/20
58/18 63/2 63/7 66/2
66/22
hearted [2] 59/4 61/6
hearts [1] 66/2
held [1] 9/1
help [14] 22/25 23/10
36/12 51/1 58/19
58/23 59/2 62/3 62/5
62/12 62/13 62/16
62/20 70/25
helped [4] 59/2 62/6
62/9 63/19
helping [3] 19/12
57/24 62/11
helps [1] 19/14
hesitate [2] 58/22
62/5
hid [1] 28/15
hiding [1] 29/10
high [12] 15/6 18/16
21/19 31/16 37/2 37/8
44/20 48/10 48/22
49/19 50/19 58/1
high-end [2] 48/10
50/19
higher [1] 7/3
hip [1] 62/24
hip-hop [1] 62/24
hired [1] 10/10
history [24] 5/17 7/3
13/18 13/22 16/16
17/20 17/22 18/1 18/4
21/6 21/7 21/7 21/10
29/21 29/22 37/23
38/1 38/20 47/22 48/1
54/4 55/10 70/22 71/6
hold [2] 9/2 43/6
holistic [1] 58/7
home [4] 45/11 66/6
67/2 67/8
homes [1] 66/1
honest [2] 42/13
58/16
honestly [4] 57/16
60/18 69/8 72/23
Honor [89]
HONORABLE [1] 1/13
hop [1] 62/24
hope [1] 66/19
hopeful [1] 75/19
hopefully [1] 27/3
hospital [1] 30/25
hour [1] 62/14
hours [8] 34/1 34/4
40/8 49/11 49/12

house [8] 16/24 16/25
62/7 62/10 62/21
62/22 64/25 65/1
household [1] 58/24
hugs [2] 63/6 63/8
humbly [1] 43/10
43/15
humor [1] 59/4
hundred [2] 41/17
41/18
hurt [5] 43/6 43/19
43/21 63/14 63/25
66/23
hurting [1] 66/14
husband [1] 67/9
hyperactive [1] 14/22
hyperactivity [3]
13/25 14/7 15/11

**I**

I'd [2] 22/17 37/3
I'll [7] 7/21 12/13
25/14 39/12 41/24
43/23 76/8
I'm [27] 4/9 8/17 8/17
8/18 9/16 10/10 10/11
25/22 26/15 26/15
30/22 35/2 38/20 48/5
48/5 53/1 57/4 57/5
59/23 65/11 66/8
68/15 72/15 72/17
72/17 72/18 75/23
I've [11] 8/18 8/24
10/7 10/10 10/12
22/17 35/9 45/2 51/16
59/9 60/4
ID [1] 32/1
idea [4] 25/12 51/1
64/9 69/4
identification [1]
32/14
identify [1] 36/10
identity [1] 28/15
ill [4] 43/6 61/14 62/1
66/23
illness [4] 18/1 54/5
54/11 69/21
imagine [2] 49/12
67/1
immature [5] 24/20
28/25 34/14 37/9
37/19
immaturity [2] 15/25
21/12
immediately [2] 55/1
74/19
impact [4] 15/15 20/4
23/18 61/20
impacted [1] 7/12
impaired [1] 16/7
important [2] 5/8
15/25
impose [3] 43/17
71/16 72/22
imposed [2] 74/24

imposes [1] 69/18
imposing [1] 72/11
impressed [2] 63/12
72/15
impression [1] 57/9
imprisoned [1] 73/6
imprisonment [3]
5/18 73/24 74/22
improve [1] 19/14
impulses [1] 19/9
impulsive [12] 14/23
16/6 17/18 18/17
26/18 28/7 28/9 29/4
30/2 31/3 31/4 53/8
impulsivity [6] 15/24
20/25 23/8 25/2
inability [3] 21/1 26/9
40/23
inappropriate [1] 35/4
inattentiveness [1]
15/24
incarcerated [2] 29/3
45/13
incarceration [2]
53/12 53/22
include [4] 4/8 47/23
including [4] 4/14
24/24 51/24 74/11
incoming [1] 46/23
incomplete [1] 4/11
inconsistency [2]
37/4 37/6
inconsistent [2] 28/20
40/22
increase [1] 23/22
incredibly [1] 47/14
independent [1]
64/14
indicated [2] 24/3
45/16
indication [1] 21/21
indictment [6] 3/10
7/2 7/4 11/5 11/5
75/10
individual [8] 6/10
12/7 24/14 47/5 49/25
50/1 52/23 57/17
individuals [5] 16/11
17/10 21/4 33/8 43/2
induced [1] 27/8
ineligible [2] 5/19
7/11
inexperienced [2]
20/8 38/11
inform [1] 59/13 73/12
information [6] 3/13
13/18 13/23 30/9 45/9
46/1
informing [1] 42/23
initial [2] 40/20 45/20
initially [1] 15/2
initials [1] 6/10
injure [1] 3/11
inkling [1] 44/2
innocent [1] 63/1

inquire [1] 8/11
inquired [1] 73/20
insanity [1] 70/4
inseparable [1] 54/20
insight [2] 66/19
66/20
insights [1] 68/18
Institute [1] 8/23
instructing [1] 68/2
instructions [1] 43/2
instruments [1] 11/21
insurance [1] 60/17
integrity [1] 58/18
intelligence [8] 16/2
31/11 31/20 36/23
37/5 37/8 37/11 52/20
intelligent [1] 37/5
intended [1] 63/23
intent [4] 40/13 40/22
42/19 49/17
intention [3] 64/2 66/3
66/23
intentions [2] 66/14
66/20
interchanged [1] 14/2
interest [2] 52/23
59/20
International [1]
30/24
Internet [1] 31/13
31/24 32/2 42/13 45/9
46/2 46/2
interstate [1] 3/11
interventions [1] 19/5
interview [2] 21/22
22/6
interviewed [1] 13/20
interviews [1] 13/11
introduced [1] 58/13
invalidated [1] 21/20
Inventory [4] 11/23
11/24 11/24 12/1
investigation [2] 3/18
4/16
involuntarily [1] 26/12
involved [4] 23/4
42/16 45/2 61/8
involvement [2] 43/9
43/13
IP [4] 31/21 32/4 32/7
32/12
IQ [1] 37/1
isolated [3] 29/23
37/24 53/7
issue [4] 4/25 68/7
69/21 69/23
issues [8] 4/12 12/21
47/23 54/12 54/15
64/22 70/17 76/11
it's [62] 4/25 5/8 8/1
13/15 15/6 15/20 16/1
16/2 16/6 16/13 21/10
22/16 22/18 22/21
22/21 24/12 24/14
24/17 26/6 26/9 26/17
26/17 26/18 26/22

it's... [38] 26/23 27/10
27/11 29/5 30/2 31/5
32/1 32/15 32/20
33/10 34/7 35/5 35/5
35/12 35/12 36/25
37/10 38/12 39/25
44/4 45/3 46/24 48/2
49/15 50/12 56/3 56/3
56/6 56/6 56/7 56/7
56/16 56/23 60/23
61/19 68/3 68/20
69/11
item [2] 12/10 21/21
items [1] 12/9

**J**
Jaime [3] 54/14 56/7
64/21
JAMES [1] 1/13
Jamie [1] 61/9
jealous [1] 66/5
Jean [1] 11/1
Jefferson [1] 57/5
jeopardize [1] 63/21
JHONES [13] 1/20
1/21 2/3 2/4 3/6 3/24
7/21 8/11 39/4 44/17
51/6 60/11 76/18
job [12] 54/16 54/25
55/1 55/3 58/21 63/16
63/20 64/7 64/10
64/10 64/12 76/18
jobs [1] 58/3
jokes [1] 59/5
Joseph [1] 67/19
Joshua [4] 56/3 56/7
56/25 57/3
judge [3] 1/14 36/15
50/2
judgment [3] 15/24
73/4 75/5
July [1] 3/8
July 13th [1] 3/8
juncture [1] 44/15
justice [4] 6/16 42/17
48/17 58/8
justifying [1] 53/1

**K**
KAREN [2] 1/18 3/7
keep [2] 59/5 64/15
Kenny [2] 4/23 54/19
keyboard [1] 26/16
killed [1] 42/25
kind [8] 20/3 20/13
27/6 28/25 29/23
34/24 35/22 59/16
kindhearted [1] 59/17
kinds [1] 35/25
knew [4] 36/12 65/3
70/3 70/4
know [36] 5/24 7/20
15/22 16/7 18/16
18/21 24/15 28/11
28/11 28/25 29/7

31/2? 31/23 35/16
35/15 35/18 35/24
36/1 41/13 44/8 50/8
50/12 51/16 54/2 58/7
58/16 59/17 60/19
63/7 66/2 66/8 67/3
69/1 70/17 70/18
71/17
knowing [2] 40/20
67/1
knowledge [2] 60/18
64/1
known [5] 14/9 56/24
57/12 58/14 61/2
knows [5] 31/12 31/13
51/13 51/16 68/3

**L**
label [1] 36/10
labor [1] 59/3
lack [3] 25/3 66/6 71/6
large [2] 17/17 18/13
lastly [2] 43/18 67/15
late [3] 17/5 36/6
51/14
latest [1] 15/10
Lauderdale [2] 1/8
1/25
laugh [1] 63/5
laughed [1] 62/25
law [12] 8/24 20/1
21/9 29/11 43/15 45/3
45/14 55/5 59/25
63/25 66/25 71/7
law-abiding [2] 55/5
71/7
layman's [1] 26/1
leading [1] 27/6
learn [2] 19/9 50/10
learned [3] 15/5 20/14
59/15
learning [1] 64/14
learns [1] 32/10
leave [3] 65/1 65/3
75/7
led [1] 24/17
left [5] 41/15 42/4 50/2
65/7 69/8
legitimate [1] 48/18
lessen [1] 15/6
lets [1] 10/14
letter [23] 39/21 40/5
40/25 41/1 41/3 41/8
41/12 41/19 42/9 49/3
49/6 49/10 49/13 54/7
56/4 57/5 57/9 58/9
60/13 60/24 67/3 67/6
69/15
letters [12] 6/9 27/20
40/20 42/19 43/1
48/19 48/20 54/6
54/23 56/22 57/1
67/25
level [8] 5/17 6/21
21/19 23/23 29/13
23/23 70/10 72/6

levels [6] 6/3 6/17/74
21/12 24/22 31/18
licensed [3] 8/17 8/18
8/18
life [13] 15/16 15/16
15/22 17/13 17/17
19/14 24/17 36/3
38/12 54/13 55/4
56/24 63/16
life-span [1] 15/22
lifestyle [1] 32/24
light [1] 59/4
light-hearted [1] 59/4
likelihood [3] 15/22
35/16 44/11
line [3] 38/14 58/12
72/23
lines [2] 34/1 39/24
lining [1] 19/15
listen [2] 22/4 27/14
61/9
little [6] 24/8 39/18
41/19 47/11 49/4
50/15
live [7] 16/4 16/5 29/1
31/10 37/7 55/15
58/22
lived [4] 52/3 62/15
64/13 64/16
lives [1] 24/19
living [8] 16/2 55/8
64/8 64/8 65/8 65/9
65/9 66/1
load [1] 62/6
local [1] 58/2
lone [2] 47/12 50/10
long [5] 20/9 1
13/17 21/6 53/4
longer [3] 6/18 53/19
59/6
look [10] 12/8 12/20
13/5 32/15 40/6 44/9
49/3 55/10 72/21 76/8
looking [1] 53/15
lose [1] 21/3
loss [1] 58/21
losses [2] 73/10 73/13
lost [2] 65/1 71/9
lot [11] 22/18 24/16
31/19 41/16 45/5
46/25 47/1 51/15
56/16 58/5 67/9
Louisiana [2] 57/5
57/7
lovable [1] 61/6
love [7] 43/12 44/7
52/22 59/20 62/2
66/22 67/4
loved [5] 43/5 61/2
64/10 65/16 65/23
loves [1] 58/17
loving [6] 57/22 57/25
59/7 61/5 63/8 65/2
low [6] 38/22 53/16
53/17 53/18 53/24
70/24

loyal [1] 58/17
loyalty [1] 43/5
lunch [1] 63/3
lunches [1] 63/9

**M**
M-FAST [1] 12/14
ma'am [1] 36/16
magic [1] 72/21
magnitude [1] 64/6
mail [6] 6/10 41/1 41/3
41/7 41/15 41/15
mailing [1] 6/11 49/2
mails [5] 39/22 39/25
41/4 41/13 49/4
making [2] 26/11 33/8
37/25 46/9 48/5 59/5
66/8
mal [1] 42/19
malingering [5] 12/4
12/15 12/18 12/25
22/21
man [10] 52/10 54/9
55/20 55/21 56/21
58/16 59/16 66/5
69/10 71/12
man's [1] 69/11
management [1] 23/5
manager [1] 64/8
mandatory [1] 5/21
manner [1] 75/1
manual [2] 15/10 59/3
March [2] 31/1 54/23
marking [1] 39/24
mask [3] 40/14 46/3
49/5
match [2] 41/18 41/19
maternal [1] 76/7
matter [10] 3/2 15/9
16/1 16/2 43/8 44/9
65/16 68/10 73/22
77/5
matters [1] 53/19
maturity [2] 24/22
24/23
maximum [1] 71/20
McDonald's [1] 62/25
McKinney [1] 7/12
McLemore [2] 10/25
51/20
McWATERS [83]
McWaters' [9] 3/16
38/4 40/7 57/4 67/17
68/25 72/5 72/17
72/19
Meade [6] 40/3 41/11
49/1 52/23 55/23
70/16
mean [10] 12/9 18/3
19/23 25/4 26/4 26/18
31/6 34/21 35/1 71/1
meaning [4] 1/17
17/23 35/10 35/11
means [6] 7/6 31/6
32/23 32/24 35/2 58/5
meant [2] 69/15 71/14

measures [2] 12/7
37/1
meat [1] 9/15
medical [1] 76/12
medicals [2] 51/17
67/13
medicate [1] 23/20
medication [8] 17/12
19/6 19/14 26/22
35/19 50/23 51/24
55/16
medications [4] 17/1
17/3 23/5 36/4
meet [2] 11/7 11/9
meetings [2] 23/13
23/14
members [4] 17/23
42/20 54/8 61/4
membership [1] 59/6
memories [1] 58/25
mental [20] 4/11 18/1
18/6 34/10 34/25
46/17 47/17 47/23
52/11 52/14 53/2 54/5
54/11 54/12 54/15
55/10 69/21 72/4
74/17 76/11
mention [1] 39/16
mentioned [3] 16/12
17/6 51/16
Merit [1] 77/2
met [5] 11/10 25/23
54/18 63/10 64/19
method [1] 49/1
Miami [6] 1/19 1/22
6/13 41/15 49/7 75/20
Miami-Dade [1] 41/15
MICHAEL [23] 8/6
8/10 54/10 54/11
54/12 54/12 54/13
54/14 54/16 56/7 61/9
61/11 61/14 61/24
62/1 64/4 64/7 64/7
64/21 64/22 65/8
65/22 65/25
middle [1] 73/2
Mike [3] 60/16 65/9
65/17
militated [1] 48/19
militates [1] 48/10
militating [1] 50/19
Miller [1] 11/25
milligram [1] 51/25
million [2] 35/14
56/12
million-dollar [1]
35/14
mind [6] 31/9 52/24
55/21 64/15 66/4
70/17
mined [1] 45/9
minimal [1] 15/2
minimize [4] 17/16
21/14 22/5 22/25
minimized [1] 21/19
minimizes [7] 13/1

**M**

minimizes... [6]  13/3
18/21 21/24 22/22
32/20 36/9
minimizing [1]  22/14
minimum [2]  52/20
58/4
Minnesota [1]  11/22
minor [1]  4/7
minority [1]  18/14
minute [1]  60/2
minutes [1]  62/22
Miranda [1]  10/4
misconduct [1]  20/16
misguided [2]  59/18
59/19
misspoke [1]  76/5
mistake [3]  46/11
50/11 66/15
mistakes [1]  50/10
mitigate [2]  48/15
48/16
mitigation [4]  5/3 5/24
39/4 70/2
MMPI [5]  12/13 21/20
34/22 35/5 35/12
MMPI-2 [5]  12/13
21/20 34/22 35/5
35/12
model [1]  33/5
mom [4]  54/14 62/5
63/20 65/20
moment [14]  16/2
16/5 23/24 25/12
25/13 26/12 26/19
26/21 28/4 28/7 31/10
32/19 39/9 75/15
money [3]  43/3 59/3
62/11
month [8]  44/17 44/19
44/20 58/21 69/19
72/9 72/14 72/22
months [19]  5/18 7/9
30/14 52/9 53/12
53/15 53/15 53/25
56/17 56/19 56/19
69/19 70/24 70/25
71/4 72/10 72/10 73/7
73/7
months' [2]  53/21
74/22
mood [4]  18/9 18/9
18/15 18/23
moot [1]  73/22
morning [10]  3/2 4/10
8/14 8/15 25/20 25/21
62/16 68/25 69/7 70/7
mother [9]  13/8 18/4
37/21 38/21 52/3 55/6
55/9 56/8 57/23
mother's [2]  16/24
62/5
motion [1]  75/11
motions [1]  75/8
motivated [3]  35/24
52/21 52/22

motivation [1]  11/9
motor [2]  26/7 26/12
move [5]  9/13 50/24
58/24 62/14 62/21
moved [1]  16/23
51/13 55/7 64/13
moving [1]  26/21
Mr [2]  55/12 55/13
Mr. [105]
Mr. Fels [15]  3/22
39/13 43/23 51/5 51/9
67/16 67/18 67/22
68/2 68/3 68/6 68/7
68/16 68/16 68/20
Mr. Fels' [1]  51/12
Mr. McKinney [1]  7/12
Mr. McWaters [70]  3/5
3/8 4/1 4/24 5/2 6/4
6/9 6/18 11/7 11/12
12/4 12/17 12/22
13/11 13/12 14/16
16/10 16/20 17/11
17/23 18/3 20/15
21/14 22/13 22/24
24/9 36/24 38/17 40/1
40/8 40/12 40/17 41/2
41/23 44/6 45/9 45/17
48/25 49/22 50/25
51/21 52/12 52/15
52/20 52/25 53/20
54/16 54/21 54/25
55/4 60/9 67/12 67/20
68/2 68/5 68/19 69/8
69/19 69/20 69/20
70/7 71/2 71/18 71/19
72/1 72/16 72/24 75/3
75/19 76/10
Mr. McWaters and [1]
4/13
Mr. McWaters' [1]
3/16 38/4 40/7 67/17
68/25 72/5 72/17
72/19
Mr. Meade [6]  40/3
41/11 49/1 52/23
55/23 70/16
Mr. or [1]  42/2
Mr. Preston [1]  67/18
Mr. Sloan [1]  67/18
MS [3]  2/3 2/4 2/4
Ms. [22]  3/24 4/23
7/21 8/11 13/8 25/16
38/16 39/4 40/7 44/17
45/16 51/6 51/9 52/3
60/11 67/5 67/6 67/9
67/11 69/6 73/15
76/18
Ms. Devon [1]  4/23
Ms. Fellabaum [5]
52/3 67/5 67/6 67/9
67/11
Ms. Gilbert [6]  25/16
38/16 40/7 45/16 51/9
69/6
Ms. Jhones [8]  3/24
7/21 8/11 39/4 44/17

Ms. Thompkins [1]
73/15
Ms. Toni [1]  13/8
Multiphasic [1]  11/22
multiple [1]  59/10
music [1]  62/24

**N**

name [10]  8/9 8/9
28/14 28/20 30/8
30/12 42/11 45/11
45/18 57/3
named [1]  14/13
nasty [1]  26/14
nature [3]  4/7 44/23
49/19
NE [1]  1/19
near [1]  76/1
nearly [1]  45/6
necessary [3]  71/20
72/12 76/20
need [8]  23/24 30/1
30/17 50/20 51/2
58/19 59/5 60/2
needed [2]  57/24
62/18
needing [1]  59/6
needle [1]  50/24
needs [4]  51/1 61/19
69/24 71/4
negate [1]  53/5
negated [2]  52/14
52/15
neither [1]  57/18
nervous [1]  26/6
network [1]  32/12
neurodevelopmental
[3]  15/12 18/17 33/10
neurological [1]  11/1
neurologist [1]  11/2
neurologists [1]
13/23
never [24]  35/9 35/24
36/12 38/13 39/22
41/1 41/1 41/14 41/15
44/3 50/4 50/4 56/1
56/12 57/12 61/10
61/14 62/1 63/13
63/20 63/24 63/25
65/10 65/15
new [9]  58/22 61/11
61/24 62/21 62/22
62/23 62/24 71/8 71/8
news [1]  61/1
night [2]  64/24 67/2
nine [9]  53/24 56/17
56/19 67/19 70/25
71/3 72/9 72/14 72/22
nine-month [2]  72/9
72/14 72/22
noises [1]  33/9
normal [3]  29/17
29/20 33/13
normally [2]  40/19
68/6

North [1]  8/19
noses [1]  21/10
note [3]  12/24 41/5
49/4
noted [4]  32/24 36/25
38/21 74/14
notes [2]  51/19 67/25
notice [1]  75/4
noticeable [1]  14/21
15/7 22/3 22/4
November [1]  1/8
11/10 11/11 42/18
November 3rd [1]
11/10
November the [1]
11/11
Novi [1]  11/2
number [5]  3/4 22/7
45/19 50/12 67/22
numerous [2]  54/13
57/14

**O**

object [1]  74/25
objection [5]  4/7 4/14
4/17 4/20 4/20
objections [2]  4/4 4/6
obligated [1]  53/19
observation [1]  40/16
observe [1]  50/1
obstruction [7]  6/16
42/16 48/17 48/17
48/18 68/12 68/13
obvious [1]  48/12
obviously [4]  26/1
41/10 44/1 47/25
Occam's [1]  48/13
occasion [3]  6/11
6/11 11/7
occasions [4]  11/10
54/13 59/1 59/10
occupation [1]  8/16
occurred [1]  55/7
odds [1]  35/23
offense [6]  5/17 6/21
10/4 19/22 44/24
49/20
offenses [1]  10/2
offer [6]  39/5 39/11
39/14 58/22 68/20
72/9
office [4]  6/13 40/4
41/9 74/4
Officer [1]  73/11
Official [1]  1/24
oftentimes [4]  11/19
17/10 18/12 20/6
okay [59]  4/4 6/3 6/23
7/20 8/2 10/16 11/6
12/22 14/6 16/9 17/6
18/1 18/7 19/17 21/14
22/23 23/24 24/5 24/14
25/25 26/3 26/21
26/24 26/25 27/9
27/16 28/7 28/11
28/14 28/17 28/19

20/7 29/10 29/24
30/20 30/23 31/11
32/7 32/8 32/9 32/19
33/3 33/12 33/16
33/22 33/24 33/25
34/7 34/18 35/1 38/24
39/8 42/9 60/3 60/5
60/8 65/4 67/2 73/22
76/23
old [3]  24/13 50/4 66/5
older [3]  15/1 15/8
54/10
once [6]  8/8 50/17
53/8 53/14 53/20
72/18
one's [1]  21/2
one-time [1]  55/22
one-to-one [1]  28/1
oneself [1]  19/8
open [1]  30/11
opened [1]  9/3
openly [1]  60/18
opens [1]  30/21
opinion [7]  20/20
20/23 37/17 38/3
38/16 42/4 68/13
opinions [1]  9/19
opposed [4]  5/4 16/3
26/19 37/10
opposing [1]  51/8
opposite [3]  12/25
13/6 61/1
oppositional [1]  14/3
optimistic [1]  63/16
order [15]  3/1 5/1 22/4
41/11 42/20 45/12
45/14 45/19 45/20
46/1 46/3 55/8 60/7
65/5 74/17
ordered [3]  3/17 73/23
74/18
ordinary [1]  47/18
organic [1]  53/6
originated [1]  49/6
ourself [1]  62/25
outlines [1]  15/11
outside [1]  47/18
overly [4]  34/18 34/23
35/8 40/19

**P**

PA [1]  1/20
pack [1]  58/23
page [3]  2/2 4/21
55/11
Page 10 [1]  4/21
pages [1]  51/17
paid [4]  46/2 55/3
55/23 58/3
Palm [8]  30/23 30/25
32/15 40/2 41/8 41/14
49/7 76/6
Paragraph [2]  4/21
72/13
Paragraph 2 [1]  72/13
Paragraph 23 [1]  4/21

**P**

parent [1] 57/24
Parenthetically [1] 61/9
parenting [1] 66/6
parents [7] 16/23 18/2 52/6 65/1 65/13 65/23 66/24
parents' [1] 64/25
Parish [1] 57/5
part [5] 4/15 5/5 41/10 43/9 74/14
participating [1] 35/20
particular [7] 9/5 12/17 39/21 44/15 44/24 47/2 47/2
particularly [2] 17/15 45/4
parties [7] 3/20 6/2 6/15 6/17 44/16 71/23 72/7
partner [1] 8/22
partnership [1] 9/4
parts [1] 54/6
pass [1] 65/8
paternal [2] 18/5 52/7
patterns [1] 23/18
pauperis [1] 75/7
pause [1] 48/22
pay [8] 14/22 22/3 45/21 63/17 70/18 72/2 74/18 75/6
paying [1] 71/7
pays [2] 30/5 32/11
peacemaker [1] 61/7
people [29] 9/10 11/18 13/5 14/25 20/7 27/11 27/17 27/19 27/20 27/21 32/24 33/10 35/6 36/11 43/5 43/12 43/21 44/7 48/14 56/8 56/24 58/19 59/12 59/18 61/1 62/25 64/15 65/6 66/24
perceived [2] 55/20 55/21
perceives [1] 67/16
percent [4] 24/22 27/14 41/17 41/19
perfect [5] 45/6 45/8
perform [5] 10/18 11/6 11/12 23/22 31/18
performed [3] 11/15 23/23 55/13
period [4] 5/2 10/13 31/1 54/24
permissible [2] 74/12 74/14
permitted [1] 9/19
person [16] 3/12 16/4 22/18 25/8 26/8 35/25 37/4 57/12 60/19 60/25 65/2 66/12

person's [1] 15/8
personal [2] 32/13 57/6
personalities [1] 47/8
personality [2] 11/23 66/20
personally [1] 46/12
pertain [1] 39/17
pertinent [1] 4/12
phone [5] 30/6 30/15 32/11 32/11 32/14
phones [8] 45/17 45/17 45/21 45/21 45/23 46/13 46/14 47/13
phonetic [1] 13/9
physically [3] 57/13 57/17 57/19
pick [2] 30/23 62/6
picture [2] 45/13 63/11
piece [1] 27/9
Piedmont [1] 58/12
place [5] 7/8 15/3 58/22 65/11 68/8
placed [1] 73/25
places [3] 44/6 44/6 46/15
plain [1] 40/1
Plaintiff [1] 1/5
plan [3] 31/6 31/8 53/7
planned [2] 53/4 63/17
planning [2] 31/2 52/14
plans [1] 10/6
platform [1] 66/18
play [3] 20/12 31/11 31/14
played [2] 19/21 20/21
playing [1] 19/13
plea [10] 3/8 3/16 6/7 19/19 20/16 20/21 44/13 53/16 53/17 70/4
pleading [1] 72/25
pleads [2] 49/25 53/11
please [15] 8/7 8/8 8/16 10/20 13/14 17/9 20/23 23/3 60/8 61/15 64/15 66/8 66/12 67/3 73/15
pled [3] 43/9 48/9 72/16
plenty [2] 27/16 27/19
point [13] 5/14 14/2 14/3 27/13 29/2 29/24 35/23 36/3 40/25 42/8 44/1 68/1 75/9
pointed [1] 48/25
police [1] 65/5
poor [6] 15/23 15/24 20/2 20/2 23/8 46/7
portrayed [2] 60/25 71/3

pose [1] 63/13
posed [2] 14/15 15/18
Posic [1] 58/11
position [3] 9/1 34/15 69/2
possess [1] 74/8
possessing [1] 74/7
possibility [2] 28/8 34/10
possible [3] 18/8 26/23 46/24
possibly [2] 26/22 34/17
post [6] 20/16 20/21 39/17 67/25 72/17 73/1
post-arrest [2] 72/17 73/1
Post-It [1] 67/25
post-plea [2] 20/16 20/21
posting [2] 45/15 45/19
potential [1] 37/7
power [1] 71/16
powered [1] 61/19
powerful [1] 35/17
powers [1] 43/10
practice [1] 9/8
practitioner [1] 9/7
prank [1] 59/19
prepaid [3] 30/5 45/25 46/3
preparation [2] 10/20 12/23
prepare [1] 66/6
prepared [1] 76/21
prescription [1] 19/6
present [8] 3/5 5/24 8/3 41/21 52/4 60/9 67/5 68/21
presented [1] 44/4
presentence [6] 3/18 3/21 4/2 4/16 71/23 74/14
presently [1] 8/21
presents [1] 41/6
PRESTON [50] 1/7 3/3 29/25 42/11 42/18 54/14 56/5 57/3 57/12 57/16 58/1 58/13 58/22 59/7 59/15 60/19 61/5 61/13 61/25 62/4 62/5 62/12 62/17 62/19 63/3 63/5 63/19 63/23 63/24 64/3 64/7 64/10 64/17 64/20 64/22 64/24 65/2 65/2 65/6 65/6 65/15 65/22 65/25 66/2 66/4 66/8 66/17 67/7 67/17 73/5
Preston would [1] 61/13
Preston's [6] 57/9 58/6 59/9 60/14 66/19

**67/7**

pretty [8] 16/16 16/25 17/17 27/10 28/13 28/17 31/12 37/23
prevent [1] 35/15
preventing [1] 51/3
previous [1] 12/24
previously [3] 9/6 39/23 70/24
primarily [1] 9/9
primary [1] 40/23
principle [1] 48/13
print [1] 33/14
prior [6] 9/5 9/8 16/11 17/2 49/2 73/10
prison [9] 27/2 27/2 41/6 41/9 48/9 48/23 50/23 50/23 56/18
prisoner [1] 42/12
Prisons [2] 73/6 76/10
private [1] 32/12
probability [3] 23/22 35/21 38/22
probably [6] 22/18 24/22 27/5 31/16 45/1 61/3
probation [7] 5/18 6/12 7/11 40/3 41/9 73/11 74/4
problem [6] 8/1 13/1 13/2 17/17 23/11 60/4
problem-solving [1] 23/11
problematic [2] 27/25 29/15
problems [12] 12/21 13/3 17/14 17/14 18/6 24/18 34/24 34/25 35/6 35/6 67/11 69/12
proceed [4] 7/1 7/4 10/3 41/22
proceedings [3] 1/12 76/24 77/4
professes [1] 56/21
professional [3] 13/22 42/4 60/17
proffer [3] 19/18 39/20 51/12
progress [1] 51/19
prohibited [1] 74/7
prompt [1] 55/3
prong [1] 53/19
pronounced [1] 75/1
prosecution [3] 10/9 10/11 10/15
prosecutor [2] 48/21 56/4
prosecutors [2] 25/22 50/2
protect [1] 43/12
protected [1] 59/10
protocol [1] 31/24
provide [4] 40/8 40/17 45/18 67/12
provided [4] 16/12 16/19 51/15 67/13

providing [1] 7/24
pseudo [1] 44/3
PSI [2] 4/8 4/11 54/17
psychiatric [2] 10/24 23/4
psychiatrist [1] 51/20
psychiatrists [1] 13/22
psychological [4] 4/15 10/25 12/20 15/8
psychologist [1] 8/17
psychologists [2] 9/10 13/22
psychology [6] 8/25 9/6 9/9 9/18 9/25 35/17
public [4] 6/14 38/17 42/15 46/1
punished [2] 29/14 70/23
punishment [3] 43/14 43/16 71/5
punitive [1] 22/20
purchased [2] 45/17 53/14
purported [1] 40/1
purpose [1] 59/19
purposeful [1] 12/16
purposes [1] 55/16
Pursuant [3] 73/9
pursue [2] 6/16 7/3
pursued [2] 53/3 53/4
put [10] 6/25 21/3 23/16 24/24 24/4 34/15 53/9 57/15 62/12 63/6
puts [3] 23/23 30/15 69/1
putting [1] 28/5

**Q**

qualifications [1] 9/13
qualified [1] 9/12
question [12] 13/8 27/1 28/4 32/10 35/14 38/15 53/25 56/17 68/23 70/21 71/5 71/13
questions [3] 9/22 36/19 38/24
quick [1] 47/6
quietly [2] 61/13 62/1
quite [2] 46/7 72/23
quote [3] 56/10 56/22 62/23
quote/unquote [1] 62/23

**R**

rage [1] 38/13
raise [1] 69/21
raised [1] 65/20
ran [1] 69/7
random [1] 47/6
randomly [1] 12/4
range [10] 5/18 5/19 5/20 7/9 7/16 7/17

**R**

range... [4] 37/1 37/2 47/18 68/11
rare [3] 22/16 22/21 32/20
rate [1] 18/16
rational [1] 57/21
razor [1] 48/13
reached [1] 6/15
read [5] 37/13 54/6 59/23 60/1 60/2
reading [1] 58/10
real [3] 38/8 38/9 62/24
realist [1] 37/10
realistic [2] 29/6 29/8
reality [1] 64/18
realized [1] 64/2
really [27] 4/21 10/12 13/3 13/6 13/17 17/2 18/20 24/13 25/25 27/13 30/8 30/13 31/5 31/12 35/1 38/13 45/7 47/17 48/16 48/18 50/11 64/10 64/20 69/15 70/13 70/17 71/14
Realtime [1] 77/3
reason [5] 29/22 43/20 46/20 60/24 68/15
reasoning [1] 15/24
reasons [2] 50/7 71/15
rebuttal [1] 51/6
receive [1] 6/4
received [7] 3/20 4/1 16/20 17/4 41/7 42/18 52/1
receives [1] 19/4
receiving [1] 23/5
recess [2] 60/6 76/23
recidivating [1] 23/16
recidivism [2] 49/22 50/6
recognize [1] 9/17
recognizing [1] 72/25
recommend [2] 75/20 76/8
recommendation [2] 22/23 76/2
recommendations [1] 75/13
recommended [1] 50/22
record [8] 6/7 6/25 8/9 8/16 48/6 49/14 60/9 77/4
records [7] 11/3 13/15 13/16 14/5 17/25 24/11 36/25
recovery [2] 23/13 23/14
REDIRECT [2] 2/4 36/21
reduce [5] 23/7 23/16

23/19 35/18 35/21
reduction [1] 70/10
reference [2] 4/25 5/4
references [1] 18/9
referrals [1] 10/14
referred [1] 30/5
reflect [1] 60/9
refused [1] 62/11
regard [2] 26/3 28/4
regarding [1] 3/14
regardless [1] 46/6
regards [3] 9/22 16/13 24/18
Regional [1] 58/12
register [1] 45/19
registered [2] 45/21 77/2
regular [3] 35/20 35/20 36/3
regulate [1] 23/11
rejected [4] 20/11 25/5 38/8 38/12
rejection [3] 38/7 52/22 53/5
related [5] 34/5 34/17 53/6 62/4 67/16
relates [1] 4/11
relationship [3] 38/7 38/9 38/10
relationships [3] 20/7 38/11 65/13
relatively [1] 13/24
release [9] 5/19 7/12 71/20 73/24 73/25 74/3 74/6 74/11 74/23
released [1] 74/5
relieved [1] 63/15
relocated [1] 16/24
remain [3] 7/13 42/22 75/20
remaining [1] 75/10
remains [1] 15/7
remind [1] 15/12
remorseful [2] 69/13 69/14
remove [1] 56/20
removed [2] 36/5 36/6
render [1] 9/19
repercussions [1] 64/3
replete [1] 16/16
report [15] 3/18 3/21 4/2 4/16 5/6 7/25 11/1 11/2 27/7 27/8 34/18 52/8 71/23 74/3 74/15
reported [2] 18/4 18/5
Reporter [4] 1/23 1/24 77/2 77/3
reports [8] 11/3 16/16 17/23 17/23 17/24 18/3 38/21 46/1
representative [1] 57/6
represented [4] 3/5 3/6 51/10 60/10
request [1] 4/18

requested [1] 35/17
required [1] 45/18
research [1] 24/21
resistant [1] 51/1
resolution [1] 68/10
resort [1] 17/11
respect [7] 5/15 13/12 42/4 50/15 51/8 51/12 67/15
respective [1] 3/20
respond [1] 68/15
responding [1] 12/9
response [6] 11/18 12/7 12/25 13/7 34/23 70/14
responsibility [9] 6/5 6/18 7/5 20/16 43/8 53/18 70/3 70/8 72/6
responsiveness [1] 13/6
rest [2] 51/4 57/11
restitution [5] 5/20 73/21 73/23
restraining [3] 5/1 55/8 65/5
restriction [1] 74/12
restroom [1] 60/2
result [2] 21/2 71/9
resulted [1] 21/13
results [1] 13/18
reveal [1] 56/9
revealed [1] 34/15
review [6] 10/21 11/4 13/10 16/18 17/19 51/15
reviewed [5] 4/2 10/23 10/24 10/25 19/18
reviewing [1] 13/15
rewards [1] 65/24
rich [1] 27/25
right [25] 4/18 5/15 7/8 7/20 8/11 9/17 15/3 25/16 26/5 26/22 29/17 29/19 30/6 30/9 30/14 30/23 31/1 39/19 51/5 54/1 68/12 70/3 71/22 75/4 76/15
rise [1] 72/5
risk [5] 10/5 23/16 38/18 38/23 50/12
risks [1] 60/17
Ritalin [1] 19/7
RMR [2] 1/23 77/8
Rock [1] 58/11
rode [1] 62/21
role [3] 19/13 19/22 20/21
role-playing [1] 19/13
row [1] 62/13
rule [3] 18/11 18/15 27/5
rule-out [2] 18/11 18/15
run [2] 73/8 74/2
ruse [1] 41/11
Russell [1] 24/21

**S**

safe [1] 42/23
salient [1] 15/7
sample [2] 40/7 49/10
samples [1] 67/25
sanctions [1] 22/20
sang [1] 62/23
sanity [1] 10/4
SASSI [1] 12/13
SASSI-4 [1] 12/13
sat [1] 67/21
satisfy [1] 25/12
Saturday [1] 62/6
save [1] 59/3
saw [3] 62/19 63/5 65/3
saying [6] 14/23 41/20 44/10 49/4 51/7 68/15
says [6] 24/13 24/21 35/5 41/5 56/25 71/18
scale [1] 12/19
scales [5] 11/17 12/6 12/12 13/2 13/3
school [4] 14/20 15/6 31/17 58/1
schools [1] 46/15
Sciences [1] 8/23
scot [1] 69/17
Screening [1] 11/24
script [2] 40/6 49/9
seal [1] 4/10
search [1] 74/14
seated [2] 8/7 60/8
second [11] 6/11 7/2 7/4 7/7 36/15 40/25 41/12 47/20 50/16 52/16 64/12
secondary [2] 18/18 22/20
seconds [1] 44/1
section [2] 35/12 72/13
see [19] 13/4 16/19 17/20 18/1 21/1 22/13 22/14 24/11 24/14 30/12 37/9 46/13 55/23 61/5 63/7 64/3 65/2 66/12 73/18
seek [1] 68/12
seeking [2] 48/17 73/21
seen [4] 14/20 15/21 22/17 57/22
sees [1] 43/16
self [2] 17/12 21/13 26/22 55/16 71/7
self-destructive [1] 21/13
self-medication [3] 17/12 26/22 55/16
self-sufficient [1] 71/7
selfless [1] 61/5
selflessness [1] 62/2
send [4] 6/9 27/20 29/11 48/19
sending [1] 48/20

sends [2] 30/24 30/25
sense [4] 35/1 44/8 53/8 59/4
sent [4] 41/14 46/3 54/23 63/11
sentence [24] 3/18 5/12 7/7 44/16 44/17 44/19 44/20 48/10 48/15 48/22 49/18 50/19 50/25 69/19 71/11 72/7 72/11 72/14 72/23 73/2 74/22 74/24 75/1 75/4
sentenced [1] 49/25
sentencing [8] 1/12 10/3 48/22 50/16 58/7 72/12 73/11 73/14 75/5
serious [5] 47/10 47/10 47/11 66/15 71/5
served [1] 10/8
service [4] 32/10 46/3 55/2 58/12
services [1] 23/5
set [11] 5/3 10/5 13/24 13/24 19/25 20/12 35/10 47/10 55/20 71/25 73/12
sets [2] 27/25 31/4
setting [4] 13/4 14/20 22/21 29/3
settings [1] 11/19
severe [2] 15/21 31/17
severity [1] 76/11
shake [2] 61/13 62/1
share [4] 54/14 60/14 60/18 66/16
Sheri [1] 8/22
shocked [1] 59/16
shoots [1] 53/13
short [2] 51/13 54/24
shot [1] 53/20
show [4] 13/3 40/21 46/7 57/20
showed [4] 21/22 41/15 62/20 63/11
showing [3] 26/15 39/24 58/23
shows [3] 41/16 46/8 50/15
shuffled [1] 65/25
siblings [4] 54/6 54/15 56/2 56/8
side [3] 10/8 18/2 66/12
sides [2] 10/13 61/10
significant [1] 31/1
similar [2] 33/19 48/21
similarities [1] 41/16
simple [2] 25/25 26/4
simplest [1] 48/13
simply [2] 40/18 57/18
singer [1] 62/23
single [3] 46/11 49/13 57/24

**S**

sir [2] 10/23 20/18
sister [2] 56/6 59/25 60/14 62/21 63/3 65/20 65/21
sister-in-law [1] 59/25
sisters [1] 56/3
sit [1] 14/22
situated [1] 8/8
situation [9] 12/11 21/3 25/4 42/24 49/24 59/11 60/20 61/12 61/24
skilled [1] 19/11
skills [3] 19/9 23/11 31/15
slightly [3] 10/14 10/15 58/4
Sloan [1] 67/18
slow [3] 16/8 47/9 61/15
slowly [1] 49/12
smart [4] 31/12 31/18 52/19 52/21
smarter [2] 31/15 37/3
smile [1] 63/7
smiled [1] 63/6
socializing [1] 64/14
socially [1] 64/18
soft [1] 61/5
solo [1] 9/7
solving [1] 23/11
somebody [5] 22/22 30/12 35/18 46/22 61/18
someone's [1] 35/18
somewhat [1] 38/1
son [4] 52/5 52/6 56/13 57/23
sorry [7] 26/15 43/20 44/19 46/20 61/17 66/24 75/23
sort [16] 6/16 12/20 26/5 27/9 28/7 29/10 31/11 33/5 33/5 33/13 40/23 44/2 44/3 47/14 47/17 49/17
sorts [1] 48/11
sotto [2] 75/18 76/4
sought [1] 36/12
source [1] 38/3
South [4] 1/21 75/21 75/22 75/24
SOUTHERN [2] 1/1 76/9
span [1] 15/22
speak [9] 12/22 13/7 13/8 35/7 37/20 44/9 44/25 50/17 66/18
special [6] 5/21 44/10 74/11 74/16 74/19 74/23
specialty [1] 34/5
specific [1] 43/1
specifically [1] 12/14
speculate [1] 56/23

speculating [1] 54/1
speed [2] 33/13 33/13
spell [1] 8/9
spent [2] 10/1 69/10
spirits [1] 59/5
spite [1] 67/11
split [1] 62/7
spoke [1] 38/13
spoken [2] 61/6 65/19
spur [1] 28/7
stable [2] 65/10 66/6
stage [2] 19/25 20/12
stamp [4] 39/23 39/24 41/2 49/2
stand [5] 33/3 33/7 33/9 41/25 76/23
standard [1] 74/10
standing [1] 53/23
stands [1] 22/3
start [3] 18/24 45/19 51/7
started [5] 15/3 54/10 55/8 55/15 64/20
starters [1] 53/15
starting [3] 13/21 14/6 53/11
state [7] 8/16 8/17 8/19 10/12 43/5 57/6 57/19
statement [10] 4/22 26/12 68/21 68/25 69/4 70/6 70/6 70/11 72/19 73/1
statements [3] 37/25 61/4 71/23
STATES [13] 1/1 1/4 1/18 3/3 3/7 3/12 3/14 6/12 40/3 51/10 71/25 73/9 74/19
Statistical [1] 15/9
statute [1] 72/11
statutory [1] 71/25
stayed [1] 62/9
step [3] 47/11 47/12 47/14
stepfather [1] 65/20
steps [3] 20/9 29/25 46/9
sticky [4] 41/4 41/19 61/11 61/24
stimulant [1] 19/6
stipulate [1] 9/14
stole [1] 52/24
stood [2] 32/25 33/1
stop [2] 25/7 26/10
stopped [2] 16/25 62/24
storage [1] 59/2
storages [1] 58/25
story [1] 41/10
strategies [2] 19/5 23/11
Street [1] 1/19
streets [1] 46/14
stress [1] 26/19
stressed [2] 24/25

23/5

strong [1] 50/18
structure [1] 65/23
structured [1] 19/8
structuring [1] 50/9
struggling [1] 58/20
stuff [1] 28/17
stuffers [1] 54/11
style [3] 11/18 12/25 34/23
stylized [5] 40/5 40/17 40/20 41/12 49/9
submit [2] 54/7 57/2
submitted [1] 39/22
subpoena [1] 33/17
substance [2] 11/23 74/9
substances [2] 19/7 36/7
substantial [2] 7/5 71/11
Subtle [1] 11/23
subvocal [1] 22/2
suffer [1] 14/17
suffering [1] 57/14
sufficient [4] 7/1 7/1 71/7 72/11
suggesting [1] 48/5
suggestion [1] 18/22
suicide [1] 52/7
summary [2] 11/14 14/18
supervised [7] 5/19 7/12 71/20 73/25 74/6 74/10 74/23
supervision [1] 71/17
supervision [1] 71/17
supplement [1] 4/8
support [2] 19/18 52/5
suppose [1] 71/3
supposed [2] 16/8 55/5
sure [21] 8/17 10/24 11/16 13/15 14/18 15/20 17/10 21/19 23/4 29/9 29/20 30/3 31/9 34/10 35/12 36/20 40/12 48/5 55/16 70/12 75/16
suspect [1] 76/9
sweet [2] 61/5 66/13
SWORN [1] 8/6
symptom [1] 23/17
symptoms [28] 11/20 11/25 12/16 12/21 15/14 15/21 15/23 16/15 16/17 18/18 18/20 21/15 21/23 21/24 21/25 22/1 22/22 23/7 23/20 32/25 33/1 33/2 33/7 34/2 34/11 34/25 35/19 36/9
system [3] 26/6 50/15 61/20
Systems [1] 11/4

**T**

table [2] 61/19 73/19
take [12] 4/25 5/3 34/11 34/4 35/11 40/6 42/6 43/8 43/10 54/13 60/2 70/2
taken [4] 42/17 49/11 55/21 65/6
talk [8] 17/16 23/21 34/9 44/14 61/10 61/11 61/23 65/15
talked [1] 34/2
talking [3] 47/21 47/21 70/9
targeted [1] 44/6
targets [2] 30/23 43/2
taught [2] 65/12 65/23
tax [1] 71/7
taxes [1] 55/3
teach [2] 23/10 62/23
team [1] 65/12
teenage [1] 16/24
teenager [1] 66/5
telephone [1] 13/8
tell [16] 8/20 9/24 10/20 10/23 11/9 13/14 19/3 20/23 23/3 25/9 39/10 42/8 68/4 69/1 69/3 70/18
telling [1] 22/18
ten [9] 22/17 32/20 45/2 53/15 53/21 56/18 62/25 70/23 73/10
tend [3] 5/10 31/10 37/8
tender [1] 25/14
tendered [1] 4/9
tends [2] 15/21 16/4
term [9] 20/16 24/3 35/4 35/5 35/13 45/6 73/7 73/25 74/1
terms [25] 4/12 5/2 9/10 10/9 13/6 13/18 15/18 18/24 21/23 22/2 22/14 22/16 23/17 24/23 26/1 31/2 31/3 38/11 46/16 53/6 67/16 68/11 70/10 73/8 74/2
test [12] 11/25 12/9 12/14 12/19 13/2 13/6 21/20 21/21 30/12 34/22 34/24 49/17
testify [2] 9/12 68/21
testimony [4] 8/4 42/3 42/14 67/14
testing [3] 11/12 12/10 13/11
tests [8] 11/14 11/16 11/18 11/22 12/2 12/2 12/6 12/12
text [1] 63/12
thank [22] 4/19 5/14 7/23 8/2 9/21 10/16

23/19 36/18 36/2 39/1 39/2 42/2 51/5 58/9 59/22 60/12 61/22 66/16 75/17 76/16 76/17 76/22
theater [1] 23/17
themself [1] 47/16
theories [1] 48/11
therapy [6] 19/8 23/9 23/20 35/20 35/21 51/2
thing [5] 25/7 31/9 41/18 53/3 59/24
things [42] 14/23 14/24 15/23 17/1 18/9 18/10 20/9 22/5 23/15 24/15 24/16 24/24 25/2 25/25 26/5 26/13 26/14 26/16 26/25 27/20 28/5 28/9 28/20 28/23 28/24 28/25 29/2 30/13 32/16 33/9 33/19 33/20 33/23 35/8 36/1 37/21 37/22 39/17 40/9 50/24 56/10 69/14
think [61] 5/3 5/8 9/10 14/12 14/25 15/4 16/6 16/13 16/15 19/10 24/3 25/10 25/11 25/14 25/23 26/24 27/23 28/4 28/9 29/1 29/5 30/14 30/16 32/21 32/23 33/22 35/2 35/10 35/14 38/10 39/15 44/9 44/10 44/25 46/22 48/1 48/12 48/24 50/16 50/18 50/21 51/9 51/10 51/16 52/18 53/1 56/21 60/22 64/5 66/5 68/3 68/20 69/11 69/13 69/13 69/15 69/16 69/25 71/5 71/10 71/15
thinking [16] 16/3 24/16 24/16 24/18 24/25 28/5 28/21 29/12 29/13 29/22 30/1 30/18 31/2 32/16 61/13 61/25
thinks [1] 33/5
Thompkins [1] 73/15
thought [8] 26/20 28/17 35/9 47/11 63/21 66/23 76/18 76/20
thoughts [5] 35/7 42/7 52/1 60/19 66/17
thousands [1] 32/21
threat [1] 3/1
threaten [4] 27/19 43/3 46/15 63/22
threatened [1] 45/11
threatening [2] 6/12

**T**

threatening... [1] 27/21

threats [12] 37/13 37/18 37/22 42/13 42/19 45/12 45/15 45/20 56/15 64/1 66/3 71/12

three [18] 5/19 6/5 6/17 7/4 7/14 7/15 12/6 12/12 33/22 54/14 60/15 61/6 62/20 70/10 71/16 73/25 74/1 74/22

three-level [1] 70/10

throat [2] 22/2 26/10

throw [2] 45/6 48/11

throwaway [2] 45/17 46/12

tick [1] 22/2

ticks [2] 26/7 26/8

tie [1] 34/12

time [36] 5/2 5/4 8/3 9/8 10/1 10/4 10/13 10/17 17/3 18/13 18/14 20/14 22/25 25/15 31/1 37/1 42/7 49/25 51/2 52/16 53/4 54/24 55/14 55/22 58/6 59/3 59/5 59/22 62/3 62/15 62/19 64/15 67/20 69/9 69/20 69/24

times [6] 11/9 17/15 22/17 24/17 33/23 58/20

timing [2] 7/24 76/19

today [3] 23/23 24/10 70/11

today's [1] 3/19

told [9] 42/21 42/22 42/24 43/4 63/9 65/3 68/5 68/7 69/6

Toni [4] 13/8 60/15 64/8 65/9

total [5] 5/16 5/22 6/21 74/20 74/22

Tourette's [11] 14/1 16/15 16/17 17/3 20/6 20/12 23/6 23/7 26/3 32/25 47/3

trace [2] 32/4 32/4

traced [1] 32/7

tracks [3] 29/10 32/13 34/15

trained [2] 19/11 23/9

transcript [1] 1/12 77/4

transfer [1] 63/18

translate [1] 26/13

transmission [1] 3/10

treated [1] 36/8

treating [2] 35/19 51/20

treatment [22] 4/12 10/6 11/3 16/20 16/25

77/4 19/1 19/3 19/3 19/9 22/24 35/25 50/20 50/21 51/23 55/13 55/14 67/12 71/20 74/13 74/17 74/17

tree [3] 62/4 62/6 62/10

tremendously [1] 39/16

triangle [1] 44/7

tried [5] 12/4 21/14 60/22 62/10 70/10

tries [3] 17/16 22/4 22/5

trigger [1] 25/2

trouble [2] 63/24 63/25

troubled [4] 57/20 72/17 72/17 72/18

trucks [1] 58/25

true [1] 43/7

truly [5] 43/20 66/4 69/13 69/18 70/13

truth [1] 22/19

truthful [1] 35/2

try [10] 12/3 13/5 33/5 33/7 36/11 45/12 45/23 51/2 61/10 61/23

trying [15] 12/7 12/10 12/19 22/19 29/11 34/7 34/8 35/2 36/9 49/1 62/22 63/1 63/12 68/19 69/16

turn [1] 7/21

turning [1] 26/11

tweaking [1] 21/9

Tweet [1] 30/15

Tweets [1] 46/4

Twitter [4] 30/11 30/13 30/20 45/19

two [17] 6/11 11/10 40/13 41/17 44/7 50/7 50/12 50/18 52/9 53/13 56/3 59/12 60/2 62/13 64/21 65/22 65/25

two-minute [1] 60/2

type [15] 12/18 16/5 17/10 18/25 19/8 19/24 22/24 23/4 26/11 26/13 26/16 26/19 37/25 38/12 40/14

types [2] 18/10 23/1

typewriter [1] 26/15

typical [3] 19/3 21/4 69/25

typically [3] 14/9 14/12 49/24

typing [1] 26/13

**U**

U.S [1] 1/14

ultimate [1] 71/4

unable [3] 24/4 72/2 75/6

uncle [1] 57/23

understand [12] 5/13 9/12 24/9 40/24 43/14 44/14 48/7 61/3 64/6 66/10 70/20 76/13

understanding [3] 7/20 26/4 66/21

understands [1] 50/8

understatement [1] 64/18

underwriter [1] 60/16

undisputed [1] 52/12

unfaithful [1] 59/14

Unfortunately [1] 71/17

unhealthy [1] 66/1

unimaginable [1] 57/14

UNITED [13] 1/1 1/4 1/18 3/3 3/6 3/12 3/14 6/12 40/3 51/10 71/25 73/9 74/19

units [2] 58/25 59/2

University [3] 55/1 63/18 63/20

unquote [1] 62/23

unrelated [1] 34/10

unskilled [1] 38/10

unspecified [1] 18/15

unstable [1] 67/8

unusual [1] 54/3

upbringing [3] 64/4 65/10 65/22

upset [3] 20/10 24/25 64/24

use [8] 12/13 14/4 16/14 17/7 19/15 28/14 32/7 32/12

uses [2] 17/15 34/22

usually [3] 13/4 14/21 15/5 24/20 33/10

utmost [1] 51/8

**V**

validity [4] 11/17 12/6 12/12 13/2

value [1] 42/4

Vanderhood [3] 56/25 57/3 59/25

variance [3] 47/25 48/3 48/5

varied [1] 13/22

various [5] 11/3 43/2 45/15 46/8 46/15

verbal [2] 26/7 26/12

version [1] 15/10

versus [1] 3/3

vibrate [1] 61/20

victim [8] 4/23 40/2 45/12 45/14 45/20 45/24 46/1 54/19

victim's [6] 45/10 45/11 45/11 45/22 73/10 73/13

victimize [1] 6/9

victims [2] 45/10 73/21

video [2] 46/13 47/13

view [2] 38/9 42/8

viewing [1] 32/4

violation [2] 3/12 3/14

violence [3] 10/5 47/7 74/13

violent [4] 38/20 57/12 57/17 57/19

virtual [1] 32/12

virtuous [4] 34/19 34/23 35/1 35/8

voce [2] 75/18 76/4

volumes [1] 50/17

VPN [1] 32/12

**W**

wage [1] 58/4

wait [4] 47/20 47/20 47/20 73/18

waiting [1] 30/16

waive [1] 10/4

walking [1] 46/12

Walmart [2] 30/5 46/12

want [25] 4/6 4/7 5/24 6/25 25/25 32/4 32/7 35/7 35/14 36/6 36/10 38/22 43/22 51/7 54/6 54/20 56/9 56/9 60/1 60/1 67/15 69/20 69/21 69/23 76/1

wanted [3] 5/13 9/13 49/8

wanting [1] 72/24

wants [2] 9/15 48/14

warrant [1] 71/10

warranted [1] 44/20

way [24] 13/16 20/4 20/11 21/13 25/6 31/12 31/13 34/14 34/14 34/16 37/9 37/10 37/10 40/20 45/23 49/5 50/24 55/5 58/19 59/13 66/11 68/2 68/8 70/1

ways [3] 24/24 31/6 57/22

we've [3] 9/3 25/23 35/22

weapons [2] 37/22 64/1

weave [1] 39/13

weekend [1] 62/8

weekends [2] 62/13 63/4

weeks [1] 30/13

weight [6] 43/10 46/17 46/20 46/25 48/4 68/24

well [33] 5/23 7/13 10/1 10/11 11/6 11/11 14/3 14/25 17/17 17/24 19/23 21/8 23/6

23/12 26/17 26/24 27/11 28/11 28/13 28/17 29/17 33/7 35/16 41/23 44/13 48/3 52/13 54/19 55/14 65/18 69/3 71/24 76/21

went [7] 47/12 54/18 55/8 55/14 62/5 67/1 67/3

when Mr [1] 55/12

wife [2] 56/5 57/10

willing [1] 62/12

wind [1] 20/8

window [3] 72/9 72/15 72/22

wisely [1] 41/2

wish [5] 5/7 39/5 39/8 39/11 43/7

wishes [1] 39/13

withdraws [1] 30/4

witness [5] 2/2 8/6 25/15 39/3 68/22

witnessed [2] 57/18 59/9

wonderful [1] 60/17

word [3] 39/12 61/14 62/1

words [4] 24/7 26/9 55/24 57/15

work [2] 54/18 60/16

worked [6] 8/24 9/7 9/8 10/10 10/13 55/2

working [1] 58/3

workout [1] 59/6

works [1] 30/12

world [9] 16/5 20/4 20/5 24/19 29/1 30/6 37/9 61/12 61/25

worry [1] 63/24

worse [4] 12/8 12/20 13/5 21/3

worth [2] 56/16 56/16

worthwhile [1] 64/11

wound [2] 41/9 49/12

write [19] 30/13 33/12 33/13 33/19 34/1 34/7 35/2 35/3 42/7 49/9 49/10 57/9 58/9 67/23 67/24 68/2 68/4 68/6 68/6

writes [3] 40/19 60/14 68/6

writing [3] 49/10 57/5 67/21

written [3] 33/23 40/5 41/13

wrong [4] 41/5 41/20 49/5 70/3

wrote [7] 34/18 40/18 42/9 49/4 49/13 56/4 67/6

**Y**

year [6] 3/8 5/5 11/11 62/13 66/5 71/16

## Y

**years [28]**  4/25 4/25
5/4 5/19 7/14 7/15
10/7 14/16 16/24 17/5
45/2 45/3 50/4 51/21
51/25 52/10 53/13
56/11 56/12 58/1
58/14 59/1 61/2 65/15
65/20 67/8 73/25 74/1
**years' [2]**  71/17 74/23
**yell [1]**  26/8
**yellow [2]**  41/4 41/19
**young [9]**  16/23 52/10
54/9 55/20 56/21 62/8
63/12 69/10 69/11
**younger [3]**  16/22
24/23 58/14
**youngest [1]**  60/15

## Z

**Zaxbys [1]**  64/13
**zero [1]**  71/13